**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al*. )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>NTSF SEAFOODS JOINT STOCK CO., )<br><br>Defendant-Intervenors. ) | Court No. 24-00082 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

<table>
<tr><td></td><td>BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td></td><td>REGINALD T. BLADES, JR.<br>Assistant Director</td></tr>
<tr><td>OF COUNSEL:<br><br>K. GARRETT KAYS<br>Attorney<br>U.S. Department of Commerce<br>Office of the Chief Counsel for Trade<br>   Enforcement and Compliance<br>1401 Constitution Avenue, NW<br>Washington, D.C. 20230</td><td>KARA M. WESTERCAMP<br>Senior Trial Counsel<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: (202) 305 7571<br>E-mail: kara.m.westercamp@usdoj.gov</td></tr>
<tr><td>January 15, 2025</td><td>Attorneys for Defendant</td></tr>
</table>

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................iii

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD.................................................................................................. 1

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 2

    I.       Administrative Determination Under Review ........................................... 2

    II.     Issues Presented For Review ..................................................................... 2

STATEMENT OF FACTS ............................................................................................ 2

SUMMARY OF ARGUMENT ..................................................................................... 8

ARGUMENT................................................................................................................. 8

    I.       Standard Of Review.................................................................................. 8

    II.     Commerce's Determination That Facts Otherwise Available With An Adverse Inference Is Not Warranted For CASEAMEX's Packing Factors Reporting Is Supported By Substantial Evidence And In Accordance With Law ..................... 10

          A.     Commerce Lawfully Determined Not To Apply Facts Otherwise Available ................................................................................... 10

          B.     Commerce Lawfully Determined Not To Apply An Adverse Inference.. 17

    III.    Commerce Lawfully Rejected CFA's Ministerial Error Allegation And Its Regulatory Scheme Is Consistent With The Statute ............................................. 20

          A.     CFA Misinterprets 19 U.S.C. § 1675(h) .................................... 21

          B.     Binding Authority Supports Commerce's Regulatory Scheme ............... 27

               1.     *Loper Bright* Does Not Undermine Commerce's Interpretation Of 19 U.S.C. § 1675(h) ........................................................ 27

               2.     Commerce Has Inherent And Explicit Authority To Create Rules Of Agency Procedure.................................................... 29

3.    The Principles Of Exhaustion And Finality Provide Legal Support For Commerce's Regulatory Scheme ........................................... 32

IV.    The Court Should Sustain Commerce's Separate Rate Calculation ..................... 35

CONCLUSION ........................................................................................................................ 36

# TABLE OF AUTHORITIES

## CASES

*Ancientree Cabinet Co., Ltd. v. United States*,
  Court No. 23-00262, Slip Op. 2024-118, 2024 WL 4564174
  (Ct. Int'l Trade Oct. 24, 2024) ................................................................. 33

*AK Steel Corp. v. United States*,
  346 F. Supp. 2d 1348, 1355 (Ct. Int'l Trade 2004) ................................. 18

*Appvion, Inc. v. United States*,
  100 F. Supp. 3d 1374 (Ct. Int'l Trade 2004) .......................................... 19

*Assan Aluminyum Sanayi ve Ticaret A.S.  v. United States*,
  624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) .......................................... 18

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ................................................................. 9

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
  464 U.S. 89 (1983) .................................................................................... 28

*Chengde Malleable Iron Gen. Factory v. United States*,
  505 F. Supp. 2d 1367 (Ct. Int'l Trade 2007) ................................... 23, 34

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) .................................................................................. 27

*Civil Aeronautics Board v. Delta Air Lines, Inc.*,
  367 U.S. 316 (1961) .................................................................................. 35

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*,
  66 F.4th 968 (Fed. Cir. 2023) .................................................................. 31

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) .................................................................................... 9

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) .................................................................................... 9

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007) ............................................................... 33

*Dofasco Inc. v. United States*,
    390 F.3d 1370 (Fed. Cir. 2004) .......................................................................... 30

*Dongtai Peak Honey Indus. Co., Ltd. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015) .......................................................................... 30

*Dorbest Ltd. v. United States*,
    462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ...................................................... 18

*Fine Furniture (Shanghai), Ltd. v. United States*,
    182 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) ...................................................... 24

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) .............................................................................. 8

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ............................................................................................. 9

*Kaiyuan Group Corp. v. United States*,
    343 F. Supp. 2d 1289 (Ct. Int'l Trade 2004) ...................................................... 22

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ........................................................................... 27, 28, 31

*M S International, Inc. v. United States*,
    32 F.4th 1145 (Fed. Cir. 2022) .......................................................................... 30

*Mannesmannrohren-Werke AG v. United States*,
    77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999) ...................................................... 13

*McCarthy v. Madigan*,
    503 U.S. 140 (1992) ........................................................................................... 33

*McKart v. United States*,
    395 U.S. 185 (1969) ........................................................................................... 32

*Melamine Chems., Inc. v. United States*,
    732 F.2d 924 (Fed. Cir. 1984) ..................................................................... 25, 26

*Mosaic Co. v. United States*,
    647 F. Supp. 3d 1358 (Ct. Int'l Trade 2023) ...................................................... 13

*Nagase & Co., Ltd v. United States*,
    719 F. Supp. 3d 1343 (Ct. Int'l Trade 2024) ...................................................... 23

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003)........................................................................ 10, 18

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995)......................................................................... 33, 34

*NTN Bearing Corp. of Am. v. United States,*
    295 F.3d 1263 (Fed. Cir. 2002)............................................................................ 17

*NTN Corp. v. United States,*
    306 F. Supp. 2d 1319 (Ct. Int'l Trade 2004) ...................................................... 18

*Nucor Corp. v. United States,*
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ........................................................ 9

*PAM, S.p.A. v. United States,*
    582 F.3d 1336 (Fed. Cir. 2009)............................................................................ 19

*Parkdale Int'l, Ltd. v. United States,*
    508 F. Supp. 2d 1338 (Ct. Int'l Trade 2007) ................................................. 20, 26

*QVD Food, Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011)............................................................................ 23

*Royal Brush Mfg., Inc. v. United States,*
    75 F.4th 1250 (Fed. Cir. 2023) ............................................................................ 29

*Sandvik Steel Co. v. United States,*
    164 F.3d 596 (Fed Cir. 1998).............................................................................. 32

*SGL Carbon LLC v. United States,*
    819 F. Supp. 2d 1352 (Ct. Int'l Trade 2012) ...................................................... 22

*Shandong Huarong Gen. Corp. v. United States,*
    159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) .......................................................... 9

*Shanghai Tainai Bearing Co. v. United States,*
    658 F. Supp. 3d 1269 (Ct. Int'l Trade 2023) ................................................. 16, 18

*Skidmore v. Swift & Co,*
    323 U.S. 134 (1944)............................................................................................ 28

*Smith-Corona Grp. v. United States,*
    713 F.2d 1568 (Fed. Cir. 1983)..................................................................... 25, 31

*Ta Chen Stainless Steel Pipe, Ltd. v. United States,*
    342 F. Supp. 2d 1191 (Ct. Int'l Trade 2004) ...................................................... 32

*Timken U.S. Corp. v. United States*,
  434 F.3d 1345 (Fed. Cir. 2006), 2006 U.S. App. LEXIS 10808, 549 U.S. 1030 (2006) ......... 34

*Udall v. Tallman*,
  380 U.S. 1 (1964).................................................................................................... 25

*Ugine & ALZ Belg., N.V. v. United States*,
  517 F. Supp. 2d 1333 (Ct. Int'l Trade 2007) ...................................................... 33

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952)................................................................................................... 32

*United States v. Salerno*,
  481 U.S. 739 (1987)................................................................................................. 20

*Vt. Yankee Nuclear Power Corp. v. Natural Resources Def. Council Inc.*,
  435 U.S. 519 (1978)................................................................................................. 29

*Wheatland Tube Co. v. United States*,
  161 F.3d 1365 (Fed. Cir. 1998)........................................................................... 9, 19

*Woodford v. Ngo*,
  548 U.S. 81 (2006).................................................................................................. 33

*Zenith Radio Corp. v. United States*,
  437 U.S. 443 (1978)................................................................................................. 25

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011).............................................................................. 16

## STATUTES

5 U.S.C. § 706......................................................................................................... 27

19 U.S.C. § 1516a(a)............................................................................................... 33

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................... 9

19 U.S.C. § 1673d(e)........................................................................................... 21, 22

19 U.S.C. § 1675d(c)(5)(A)...................................................................................... 35

19 U.S.C. § 1675(g)................................................................................................. 30

19 U.S.C. § 1675(h).......................................................................................... passim

19 U.S.C. § 1677b(a) ........................................................................................... 3

19 U.S.C. § 1677b(a)(6)(A) ........................................................................... 10, 13

19 U.S.C. § 1677b(c) ........................................................................................... 3

19 U.S.C. § 1677e ............................................................................................. 10

19 U.S.C. § 1677e(a) .................................................................................... passim

19 U.S.C. § 1677e(a)(1) ..................................................................................... 6

19 U.S.C. § 1677e(a)(2) ..................................................................................... 6

19 U.S.C. § 1677e(a)(2)(A) .............................................................................. 17

19 U.S.C. § 1677e(b) .................................................................................... passim

19 U.S.C. § 1677m(d) ........................................................................................ 17

19 U.S.C. § 1677m(e) ........................................................................................ 17

19 U.S.C. § 3512(d) ........................................................................................... 30

19 U.S.C. § 3513(a)(2) ....................................................................................... 30

28 U.S.C. § 2637(d) ........................................................................................... 33

Public L. No. 103-465, 108 Stat. 4809, 4864 (1994) ................................... 29, 30

## RULES

Rule 56.2 .................................................................................................... 1, 2

## REGULATIONS

19 C.F.R. § 351.104(a)(2)(iii) ............................................................................ 8

19 C.F.R. § 351.224 ..................................................................................... passim

19 C.F.R. § 351.224(c)(1) ............................................................................ passim

19 C.F.R. § 351.224(e) ....................................................................................... 31

19 C.F.R. § 351.302(d) ........................................................................................ 8

19 C.F.R. § 351.309(c)(2) ............................................................................ passim

## LEGISLATIVE HISTORY

H.R. Rep. No. 100-40, Pt. 1, at 144 (1987) ................................................................. 22

H.R. Doc. 103-316, Vol. 1 (1994) (SAA).................................................................... 30

## FEDERAL REGISTER NOTICES

*Antidumping Duties; Countervailing Duties*,
    62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997). ..................................... 23

*Ferrosilicon from Brazil*,
    62 Fed. Reg. 54,085 (Dep't of Commerce Oct. 17, 1997)........................................ 23

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
    68 Fed. Reg. 47,909 (Dep't of Commerce August 12, 2003)...................................... 2

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    87 Fed. Reg. 61,278 (Dep't of Commerce Oct. 11, 2022),......................................... 3

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
    88 Fed. Reg. 61,525 (September 7, 2023) .................................................................. 5

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
    89 Fed. Reg. 18,595 (Dep't of Commerce Mar. 14, 2024)................................... 1, 2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00082 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CAN THO IMPORT EXPORT SEAFOOD | ) | |
| JOINT STOCK COMPANY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, CFA), ECF No. 27 (CFA Br.).  CFA challenges certain aspects of the United States Department of Commerce's (Commerce) final results in the 2021-22 administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam (Vietnam).  *See Certain Frozen Fish Fillets From the Socialist*

*Republic of Vietnam*, 89 Fed. Reg. 18,595 (Dep't of Commerce Mar. 14, 2024) (final admin.

review and partial recission).  Commerce's final results are supported by substantial evidence

and are in accordance with law.  Accordingly, we respectfully request that the Court deny CFA's

motion, sustain Commerce's final results, and enter judgment for the United States.

<u>STATEMENT PURSUANT TO RULE 56.2</u>

I.    <u>Administrative Determination Under Review</u>

CFA challenges the final results of the 2021-2022 antidumping duty administrative

review of the order covering fish fillets from Vietnam.  *Certain Frozen Fish Fillets From the*

*Socialist Republic of Vietnam*, 89 Fed. Reg. 18,595 (Dep't of Commerce Mar. 14, 2024) (final

admin. review and partial recission) (Final Results), Appx05724-05727**,** and accompanying

issues and decision memorandum (Dep't of Commerce Mar. 5, 2024) (IDM), Appx05691-05723.

The administrative review covers the period of review of August 1, 2021, through July 31, 2022.

*Id.*

II.    <u>Issues Presented For Review</u>

1.    Whether Commerce's determination, not to rely on the use of facts otherwise

available with an adverse inference, is supported by substantial evidence and is in accordance

with law, because CASEAMEX complied with Commerce's requests for factors of production

information.

2.    Whether Commerce's rejection of CFA's untimely ministerial error allegation is

in accordance with law and supported by substantial evidence.

<u>STATEMENT OF FACTS</u>

Since August 2003, Commerce has been administering the Order covering certain frozen

fish fillets from Vietnam.  *See Certain Frozen Fish Fillets from the Socialist Republic of*

2

*Vietnam*, 68 Fed. Reg. 47,909 (Dep't of Commerce August 12, 2003) (Order).  On October 11, 2022, Commerce initiated an administrative review, *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 61,278, 61,282 (Dep't of Commerce Oct. 11, 2022), Appx01044-01055, and later selected Can Tho Import Export Seafood Joint Stock Company (CASEAMEX) as a mandatory respondent.  *See* Appx80135-80139.

Soon after, Commerce issued its initial questionnaire to CASEAMEX.  Appx01078-01194.  Commerce explained that, because Vietnam is a non-market economy and because Commerce could not calculate normal value, pursuant to 19 U.S.C. § 1677b(a), Commerce will calculate normal value by valuing the Vietnamese producer's factors of production in one or more market-economy countries.  Appx01078 (citing 19 U.S.C. § 1677b(c)).  The factors of production include, but are not limited to (1) the hours of labor required to produce the merchandise, (2) the quantities of raw materials employed, (3) the amounts of energy and other utilities consumed, and (4) representative capital costs, including depreciation.  Appx01160.  For general reporting of factors of production, Commerce instructed CASEAMEX that, "{u}nless otherwise instructed by Commerce, you should report factors information for *all* models or product types in the U.S. market sales listing submitted . . . in response to Section C of the questionnaire, including that portion of the production that was not destined for the United States."  Appx01135 (emphasis added)**.**  Commerce's initial questionnaire also provided further instruction specific to packing expenses and directed CASEAMEX to report the type and quantity of packing materials "used to pack a unit of the merchandise under consideration for export to the United States."  Appx01144; *see also* Appx81885-81886.  Additionally, as part of its narrative instructions for this factor of production, Commerce instructed CASEAMEX to "{d}escribe the method used to pack the merchandise under consideration for shipment to the

United States." *Id.* In response to Commerce's request for factors of production reporting for packing materials, CASEAMEX reported its usage of boxes, strip, bag, and tape with "the per-kilogram amount of the relevant packing materials specifically consumed to pack one kilogram of the subject merchandise shipped to the United States during the {period of review}." Appx81886; *see* Appx02171.

Commerce issued a questionnaire requesting CASEAMEX to "resubmit your {factors of production} database to include PACKTYPE {factors of production} that incorporate all packing materials associated with each control number (CONNUM) regardless of whether those packing materials were used for shipments to the United States." Appx04168, Appx84275**.** CASEAMEX responded that, "{t}o determine the per-unit packing material {factor of production} for each packing type, CASEAMEX traced all packing types used for its U.S. sales of {merchandise under consideration} during the {period of review}." Appx84461. Indeed, CASEAMEX stated that "{t}he Department's reporting instructions with respect to packing is to 'report in separate columns each type of packing material and the quantity used to pack a unit of the **merchandise under consideration for export to the United States**.'" Appx84462 (emphasis in original). CASEAMEX continued, "consistent with these instructions, CASEAMEX continues to report its packing information based on the packing types for the {merchandise under consideration} sold to the U.S. market." *Id.*

On August 15, 2023, CFA submitted pre-preliminary comments, arguing, among other things, that CASEAMEX failed to properly report packing factors of production consistent with Commerce's instructions. Appx89429. CFA argued that Commerce should apply total facts available with an adverse inference and "account for CASEAMEX's failure to properly report its packing {factors of production}" by "apply{ing} the highest reported packing {factors of

production} for each packing input to each CONNUM." Appx89431. In response, CASEAMEX contrasted its responsiveness to non-cooperative respondents, and explained that it is a first-time mandatory respondent, has responded timely and accurately to each of Commerce's questionnaires, has provided more than 135 exhibits (totaling 3,300 pages), and when necessary, has notified Commerce of any reporting difficulties. Appx05392. CASEAMEX argued that, even though it has amended some of its reported factors of production data at the request of Commerce, such revisions are quite normal over the course of an administrative review. *Id.*

On September 7, 2023, Commerce released its preliminary results. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 88 Fed. Reg. 61,525 (September 7, 2023) (prelim admin. review and determ. of no shipments and intent to rescind) (Preliminary Results), Appx05420-05422, and accompanying Preliminary Decision Memorandum (PDM). Appx05395. In its preliminary results, Commerce assigned CASEAMEX a $0.14 per kilogram weighted-average dumping margin. Appx05421.

In its case brief before Commerce, CFA asserted the same argument from their pre-preliminary comments, arguing that CASEAMEX failed to properly report packing factors of production, such that the application of total facts available with an adverse inference is necessary. Appx90043-90044**.** According to CFA, if Commerce does not apply total facts available with an adverse inference, Commerce should use partial facts available with an adverse inference and adjust the reported packing factors of production by applying the highest reported packing factors of production for each packing input to each CONNUM. Appx90045. In response, CASEAMEX disagreed with CFA's characterization of its factors of production reporting, arguing that it adequately explained its packing factors of production reporting

methodology, which was responsive to Commerce's April 25, 2023, questionnaire and consistent with the instructions contained in the Initial Questionnaire.  Appx90063, Appx90066-90068**.** Thus, CASEAMEX argued that its responsiveness and cooperation in the administrative review does not warrant the application of facts available with an adverse inference.  Appx90057-90058, Appx90063-90064.

On March 14, 2024, Commerce published the final results.  Appx05691-05727.  In the final results, Commerce continued to not apply facts available with an adverse inference to CASEAMEX.  Appx05700-05707**.**  Although CFA had argued that Commerce should apply facts available with an adverse inference to numerous parts of CASEAMEX's reporting, including the reporting of CASEAMEX's packing material factors of production, Appx90036-90045, Commerce disagreed with CFA's arguments and explained that "in most of the cited instances, CASEAMEX adequately explained its reporting and/or Commerce did not request that the company report in a different manner."  Appx05703**.**  Thus, Commerce explained that "there is generally no basis to rely on the facts otherwise available in reaching our determination, and we need not determine whether an adverse inference is warranted in selecting from among those facts pursuant to {19 U.S.C. §§ 1677e(a)(1) and (2), and (b)}." *Id.*  With respect to CASEAMEX's reporting of factors of production in general, Commerce acknowledged that it did, indeed, issue the following request:

> {u}nless otherwise instructed by {Commerce}, you should report factors information for all models or product types in the U.S. market sales listing submitted . . . in response to Section C of the questionnaire, including that portion of the production that was not destined for the United States.

Appx05707 (citing Appx01135).  However, Commerce also explained that it delineated, in several instances, the parameters of its request for information as it related to packing materials.

For example, the instructions for reporting factors of production for packing materials indicate that the respondent should only "{d}escribe the method used to pack the merchandise under consideration for shipment *to the United States*."  Appx05707 (citing Appx01144, Appx81885-81886) (emphasis added).  Thus, Commerce determined that CASEAMEX reported its packing material factors of production in an acceptable manner and that the use of facts available was not warranted, including the use of an adverse inference.  Appx05707**.**  In the final results, Commerce did not apply facts available with an adverse inference to CASEAMEX but made certain changes to the calculation of CASEAMEX's applicable rate.  Appx05693-05694.  Commerce calculated a $0.18 per kilogram weight average dumping margin for CASEAMEX, and all other separate rate companies, because it was the only rate that was not *de minimis* or based entirely on facts available.  Appx05724-05725.

On March 25, 2024, CFA submitted ministerial error comments, requesting Commerce make certain changes to CASEAMEX's marine insurance in the calculation of the final results.  Appx90565-90567.  In response, both CASEAMEX and Hung Vuong Corporation submitted rebuttal comments, arguing that the ministerial error allegation was untimely raised and should have been raised in CFA's administrative case brief.  Appx05749-05752-05757.  On April 2, 2024, Commerce rejected CFA's ministerial error comments, because they constituted an untimely ministerial error allegation.  Appx05758.  Specifically, pursuant to 19 C.F.R. §§ 351.224(c)(1) and 351.309(c)(2), because the errors were included in the preliminary results, Commerce found that the errors should have been included in CFA's case brief and therefore constitute an untimely ministerial error allegation.  *Id.*; *see* Appx89527, Appx89549, Appx89572 (alleged error in preliminary results); *see also* Appx90399 (alleged error in final results).

Pursuant to 19 C.F.R. §§ 351.302(d) and 351.104(a)(2)(iii), Commerce rejected the filing from the record of this proceeding.  *Id.*; *see also* Appx05759, Appx90564.

<u>SUMMARY OF ARGUMENT</u>

Substantial evidence supports Commerce's determination that the use of facts otherwise available with an adverse inference was not warranted for CASEAMEX's reporting of packing materials factors of production.  Contrary to CFA's argument that CASEAMEX did not adequately respond to Commerce's questionnaires, Commerce explained that CASEAEMX's reporting was acceptable and was responsive to Commerce's questionnaires.  Also, because Commerce found that there were no gaps on the record, contrary to CFA's claims, Commerce's determination not to apply facts available with an adverse inference is supported by substantial evidence and in accordance with law.

Second, Commerce's regulatory scheme, which requires errors included in its preliminary results to be raised in a party's case brief, is consistent with the statute.  CFA's argument, that the statute requires Commerce to address ministerial error allegations after the final results, even if the error was present in the preliminary results, is an overly restrictive interpretation of the statutory scheme.  Commerce has inherent and statutorily delegated authority to promulgate procedural regulations.  Finally, Commerce's regulatory scheme balances Commerce's interest between finality and accuracy.

<u>ARGUMENT</u>

I.    <u>Standard of Review</u>

"{T}he Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034,

1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  Substantial evidence is "more

than a mere scintilla" of relevant evidence.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938).  It is only "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion, taking into account the entire record, including whatever fairly detracts

from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562

(Fed. Cir. 1984) (internal quotations and citations omitted).  "{T}his is something less than the

weight of the evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations

omitted).  "{T}he possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence."  *Id*.

Rather, when Congress has entrusted an agency to administer a statute that demands inherently

fact intensive inquiries—as in this administrative review—Commerce's conclusions may be set

aside only if the record contains evidence "so compelling that no reasonable factfinder" could

reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord

Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

    Thus, "the Court will not disturb an agency determination if its factual findings are

reasonable and supported by the record as a whole, even if there is some evidence that detracts

from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d

714, 718 (Ct. Int'l Trade 2001).  Lastly, it is not necessary for Commerce to provide "{a}n

explicit explanation . . . where {its} decisional path is reasonably discernible."  *Wheatland Tube

Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citation omitted).

II.    Commerce's Determination That Facts Otherwise Available With An Adverse Inference
       Is Not Warranted For CASEAMEX's Packing Factors Reporting Is Supported By
       Substantial Evidence And In Accordance With Law

       Commerce's use of CASEAMEX's reported factors of production rather than resorting to

adverse inferences is supported by substantial evidence and in accordance with law.  CFA argues

that Commerce failed to explain its rationale for not applying facts available with an adverse

inference to CASEAMEX's reporting of its factors of production for packing materials.  CFA Br.

at 7-10.  Specifically, CFA argues that Commerce's decision is inconsistent with the record and

that it disagrees with what Commerce determined to be "acceptable" in terms of reporting of the

packing factors of production.  *Id.*  These arguments are meritless, as we explain below.

       A.    Commerce Lawfully Determined Not To Apply Facts Otherwise Available

       Before determining whether to apply an adverse inference, Commerce must determine

whether to rely on facts otherwise available, pursuant to 19 U.S.C. § 1677e(a).  Under 19 U.S.C.

§ 1677e, Commerce can rely on facts otherwise available when "necessary information is not

available on the record" or "an interested party or any other person withholds information that

has been requested."  *Id.* § 1677e(a).  Only after determining that reliance on facts otherwise

available is necessary can Commerce apply an adverse inference if a party has "failed to

cooperate by not acting to the best of its ability to comply with a request for information."

*Id.* § 1677e(b).  The "best of its ability" standard requires the respondent to put forth its

maximum effort to investigate and to obtain full and complete answers to Commerce's

inquiries.  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

       Specifically, 19 U.S.C. § 1677b(a)(6)(A) directs Commerce, when constructing normal

value, to increase the home market price "by the cost of all containers and coverings and all other

costs, charges, and expenses incident to placing the subject merchandise in condition packed

ready for shipment to the United States."  Commerce explained that it calculated normal value based on factors of production that CASEAMEX reported for farming live whole fish, processing live whole fish, packing frozen fish fillets, and sale of by-products.  Appx89522.  To calculate normal value, Commerce first calculated the direct materials which are the farming and processing factors, including the attendant energy and labor costs, the sum of which is the cost of manufacture.  Appx89524.  Then, Commerce multiplied the cost of manufacture by the overhead ratio to calculate the overhead cost.  *Id.*  Commerce added cost of manufacture and overhead cost to derive the total cost of manufacture (TOTCOM) and multiplied the sum by the selling, general, and administrative (SG&A) expense ratio to calculate SG&A cost.  *Id.*  Commerce then calculated profit by adding the TOTCOM and SG&A costs and multiplied the sum by the profit ratio.  *Id.*  Normal value equals TOTCOM added to overhead, SG&A, *packing*, and profit, minus the absolute value of the byproducts.  *Id.*

Commerce explained that CASEAMEX had reported its factors of production for packing materials in an acceptable manner.  Appx05707.  Generally, Commerce instructed CASEAMEX to report *all* factors of production "including that portion of the production that was not destined for the United States."  Appx01135.  This general instruction for factors of production reporting, however, is qualified by "unless otherwise instructed."  *Id.*  Commerce's initial questionnaire delineated, in several instances, its specific request for information as it related to packing materials.  For instance, the instructions for reporting factors of production for packing materials indicate that the respondent should only "{d}escribe the method used to pack the merchandise under consideration for shipment *to the United States*."  Appx05707 (citing Appx01144, Appx81885-81886) (emphasis added).  On numerous other occasions, Commerce's initial questionnaire referenced packing as it relates to the U.S. market.  Appx81868 ("Include every

factor used in the production of this merchandise, and in packing the merchandise for shipment to the United States."), Appx81885 ("Report in separate columns each type of packing material and the quantity used to pack a unit of the merchandise under consideration for export to the United States."), Appx81887 ("Report in separate columns the labor hours necessary for packing a unit of the merchandise under consideration for export to the United States."). With respect to reporting packing costs, these specific instructions, regarding how information regarding packing costs must be reported, control over a general reporting instruction, which is expressly qualified by "unless otherwise instructed." Appx01135. As a result, Commerce determined that CASEAMEX's reporting was consistent with Commerce's initial request for information. Appx05707.

Although CFA argues that Commerce directed CASEAMEX in a supplemental questionnaire to modify its reporting to cover packing costs for all destinations (not just shipments to the United States), CFA Br. at 7-8, this was the only time Commerce requested the data in the revised manner. Appx84275, Appx84462. Commerce explained that CASEAMEX otherwise provided an explanation of why its reporting methodology was consistent with Commerce's reporting requirements and, subsequently, Commerce did not issue a supplemental questionnaire on this issue, despite having issued three supplemental questionnaires following receipt of CASEAMEX's response. Appx05707, Appx89122-89127, Appx89404-89407, Appx89484-89487. Because Commerce determined that CASEAMEX responded in a manner consistent with its questionnaires, Commerce explained that there is no basis to rely on the facts otherwise available, pursuant to 19 U.S.C. § 1677e(a). Appx05703.

CFA disagrees with Commerce's determination that there is no "gap" on the record, warranting the use of facts otherwise available. *See* CFA Br. at 9-10. Specifically, CFA states

that it is not clear why Commerce continued to disregard its prior instruction to CASEAMEX regarding the reporting of packing factors of production. *See id.* at 10. However, CFA mischaracterizes Commerce's initial request for information which–as observed above–references packing costs/labor associated with *shipments to the United States*. Appx01144; *see also* Appx81885-81886. Indeed, Commerce's requests for such packing information reflects the statute's directive, which requires Commerce to increase home market prices "by the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition *packed ready for shipment to the United States*." 19 U.S.C. § 1677b(a)(6)(A) (emphasis added). Moreover, CFA fails to acknowledge that Commerce has "considerable discretion in deciding whether a party has sufficiently replied to an information request." *Mosaic Co. v. United States*, 647 F. Supp. 3d 1358, 1369 (Ct. Int'l Trade 2023) (citing *Mannesmannrohren-Werke AG v. United States*, 77 F. Supp. 2d 1302, 1321 (Ct. Int'l Trade 1999)).

Moreover, contrary to CFA's argument, there is no "gap" in CASEAMEX's reporting of packing factors of production. First, CASEAMEX reported its *total* amount of packing factors of production consumed, its suppliers of such packing materials, and *per-unit* amount used of packing material factors of production to produce one unit of the merchandise under consideration destined to the United States. Appx81984, Appx84275**,** Appx84461, Appx88810-88811. CASEAMEX also explained its reporting methodology. *Id.* Second, CFA does not argue that the figures for the value of each packing factor of production that Commerce used in calculating normal value for packing factors of production–box, strap, bag, tape, and packing labels–are unreliable or unusable. *See generally* CASEAMEX Br.; *see also* Appx90146 (including factors of production values for normal value calculation). Although CFA argues that

13

global (as distinguished from U.S.-specific) packing expenses are missing, CFA Br. at 8-10, as explained above, 19 U.S.C. § 1677b(a)(6)(A) refers to "expenses incident to placing the subject merchandise in condition *packed ready for shipment to the United States*." (emphasis added). Commerce reasonably declined to further pursue information regarding global packing expenses and, instead, used reported information for packing expenses relating to shipments to the United States in the administrative review. *Id.*; *see also* Appx05707.

Indeed, Commerce distinguished between the areas of CASEAMEX's reporting when neutral facts available was necessary. Appx05703-05707. Although CFA argued that Commerce should apply facts available with an adverse inference to numerous areas of CASEAMEX's reporting, Commerce largely disagreed with each of CFA's assertions, except for one. *Id.*; *see also* Appx90036-90045. Specifically, Commerce found that facts available was not warranted for CASEAMEX's universe of sales reporting, inclusion of additional freight costs, sales destinations, movement expenses, purchases of subject merchandise factors of production purchased from an unaffiliated third party, reporting of monitored glazing, water usage, let alone its reporting of packing materials. Appx05703-05707. The only instance when Commerce determined that there was a "gap" in the record, which warranted the application of neutral facts available, was CASEAMEX's reporting of labor hours. Appx05706-05707. Because CASEAMEX reported labor hours for only three months of operations, Commerce calculated an adjustment factor based on the discrepancy for the three months in question and applied that adjustment to all 12 months in CASEAMEX's labor calculations. Appx05707. Thus, because CASEAMEX reported its packing factors of production for shipments to the United States, Commerce found its reporting to be in an acceptable manner, such that facts overwise available was not warranted. Appx05703, Appx05707.

14

Undeterred, CFA references Commerce's preference to calculate normal value based on a company's production costs to manufacture products for both home and third-country markets, to argue that there is a gap in the record. CFA. Br. at 7 n.2 (citing Import Administration Policy Bulletin 10.3, regarding "Factor of Production reporting Requirements for Non-Market Economy Companies with Multiple Facilities and/or Production Processes/Lines," (Policy Bulletin 10.3) available at https://access.trade.gov/Resources/policy/PB-10.3.pdf). A policy bulletin cannot override the statute, which limits the relevant adjustment to packing expenses for shipments to the U.S. market, and CFA also misinterprets Policy Bulletin 10.3.

As part of Commerce's reporting requests, it asks respondents to report material factors information for all models or product types in the U.S. market sales, including that portion of the production that was not destined for the United States. Appx01135. This caveat is included in Commerce's factors of production reporting instructions so that respondents do not report consumption rates from only their most efficient factories or production lines, which would result in an understatement of the average per-unit consumption rate for each input used in the production of the merchandise. Policy Bulletin 10.3 at 2. CFA's concerns about CASEAMEX's reporting fail to meaningfully identify a "gap" in the record.[1] Commerce's initial questionnaire

---

[1] Although Commerce's policy generally requests reporting when multiple manufacturing facilities exist, CASEAMEX has only one factory. Appx81861 ("During the {period of review}, CASEAMEX sold subject merchandise to the United States that was manufactured in its sole factory, which is located at lot 2.12, Tra Noc II IZ, O Mon District, Can Tho City."). Additionally, in its brief to the agency and to this Court, CFA does not identify any product lines or CONNUMs for which packing material factors of production are missing. Said differently, although CASEAMEX reported hundreds of CONNUMs, some of which may or may not have been destined for third-country markets, CFA is unable to identify any factors of production consumption or per-unit value of *any* packing input for which there is a gap in CASEAMEX's reporting. Appx85710-85717 (explaining no CONNUM is missing its reported "PACKINGSTYLE" reported requirement); *see also* Appx90263, Appx90316 (no packing factors of production figures are missing in Commerce's calculations of CASEAMEX's margin).

qualified its reporting of global factors of production reporting, requesting that CASEAMEX report its packing factors of production for shipments *to the United States*. *See* Appx81885-81886, Appx81868, Appx81885, Appx81887 (recognizing multiple instances when Commerce qualified its request for packing factors of production in its initial questionnaire to include only products used for shipment to the United States). Thus, as contrasted to requested information when the use of facts available is necessary (*i.e.*, CASEAMEX's reported labor hours), CFA merely disagrees with CASEAMEX's reporting that Commerce found to be acceptable. Appx84462, Appx05707.

As this Court has explained, "{a}lthough § 1677e(a) and § 1677e(b) are often collapsed into 'adverse facts available' or 'AFA,' the two statutory processes require distinct analyses rather than the single analysis implied by the term 'AFA.'" *Shanghai Tainai Bearing Co. v. United States*, 658 F. Supp. 3d 1269, 1282 (Ct. Int'l Trade 2023). Commerce first must determine that it is missing necessary information; and, if it wants to fill the resulting gap with facts that reflect an adverse inference against an interested party, Commerce must secondarily determine that the party has failed to cooperate by not acting to the best of its ability. *Id.* (citing *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011)). Because CFA cannot identify a "gap" on the record, other than its mere disagreement with Commerce's determination that CASEAMEX's packing material factors of production were reported in an acceptable manner, the Court should sustain Commerce's finding that application of facts otherwise available is not necessary for CASEAMEX's reporting of packing material factors of production. *See* Appx05707; 19 U.S.C. §1677e(a).

B.     Commerce Lawfully Determined Not To Apply An Adverse Inference

CFA argues that Commerce's reasoning for not applying an adverse inference is "inconsistent with the record" and is "inadequately explained."  CFA Br. at 9.  CFA also argues that CASEAMEX ignored Commerce's supplemental questionnaires requesting that CASEAMEX report the packing materials for its global sales.  *Id.* at 10.  CFA's argument, however, rests on misinterpretations of the statute and administrative record and, thus, should be rejected.

Commerce explained that the application of facts available with an adverse inference to CASEAMEX is not warranted.  Appx05703.  Specifically, in most of the cited instances, CASEAMEX adequately explained its reporting or Commerce did not request that the company report in a different manner.  *Id.*  Thus, because Commerce explained that there was no basis to rely on facts otherwise available (other than CASEAMEX's reporting of labor hours), Commerce need not determine whether an adverse inference is warranted in selecting from among those facts pursuant to 19 U.S.C. § 1677e(b) for all or individual perceived deficiencies in CASEAMEX's reporting.  Appx05703, Appx05707.

Under the broad discretion afforded to Commerce by 19 U.S.C. § 1677e(b), Commerce reasonably refrained from applying an adverse inference.  Subject to 19 U.S.C. § 1677m(d), Commerce "shall" use facts otherwise available in reaching its determination when, among other factors, an interested party "withholds information that has been requested."  *Id.* § 1677e(a)(2)(A).  Section 1677m(e) tempers this requirement, providing that information "submitted by interested parties and {that} does not meet all of Commerce's applicable requirements, shall be considered by Commerce if the information is timely, it can be verified, it is sufficiently complete to be reliable, the interested party acted to the best of its ability in

17

supplying the data, and the information may be used without difficulties or distortions." *NTN Bearing Corp. of Am. v. United States*, 295 F.3d 1263, 1268 (Fed. Cir. 2002). Section 1677m(e) further supports the notion that Commerce is not bound by its initial request and as appropriate, it may modify its requests for information and consider information that does not meet all of Commerce's applicable requirements within the bounds the statute provides.

Indeed, Commerce "may" use an adverse inference in selecting from facts otherwise available when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). Although Section 1677e does not define "the best of its ability," the Federal Circuit has interpreted this phrase as requiring a "respondent to do the maximum it is able to do." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). As indicated by the word "may," "Commerce enjoys broad, although not unlimited, discretion with regard to the propriety of its use of facts available." *NTN Corp. v. United States,* 306 F. Supp. 2d 1319, 1329 (Ct. Int'l Trade 2004).

Only when a party has "failed to cooperate by not acting to the best of its ability . . . {to meet} a request for information from" Commerce, does section 1677e(b) grant Commerce the discretion to use adverse inferences when "'selecting' from the array of 'facts otherwise available.'" 19 U.S.C. § 1677e(b). Fundamentally, "that this authority is *discretionary* is manifested by section 1677e(b)'s use of the permissive term 'may,' which stands in contraposition to section 1677e(a)'s use of the *mandatory* term 'shall.'" *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1317 (Ct. Int'l Trade 2006) (citations omitted); *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1378 (Ct. Int'l Trade 2023); *AK Steel Corp. v. United States*, 346 F. Supp. 2d 1348, 1355 (Ct. Int'l Trade 2004).

CFA misapplies 19 U.S.C. § 1677e(b) when it asserts that CASEAMEX failed to act to the best of its ability.  CFA Br. at 8.  As discussed above, Commerce found that CASEAMEX's material factors of production reporting was acceptable such that there was no "gap on the record" under § 1677e(a), Appx05707**,** thus, it was unnecessary for Commerce to determine whether an adverse inference is warranted under § 1677e(b).  *Shanghai Tainai Bearing Co.,* 658 F. Supp. 3d at 1282.  Because there was no gap on the record warranting an analysis of facts available, it was unnecessary for Commerce to determine whether an adverse inference was warranted.  *See id.*

Undeterred, CFA argues that Commerce failed "to articulate a rational connection between the agency's choice and the record facts" when it did not make an adverse inference when selecting among the facts available.  *See* CFA Br. at 9-10.  But this Court has repeatedly rejected this argument.  Specifically, this Court has held that Commerce has broad discretion when "considering whether to apply {an adverse inference}" under 19 U.S.C. § 1677e(b), and "this discretion does not require that Commerce show that an {interested party} cooperated to the best of its ability *every time it determines that {facts available with an adverse inference} should not be applied*."  *Appvion, Inc. v. United States*, 100 F. Supp. 3d 1374, 1382 (Ct. Int'l Trade 2004) (citing *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339-40 (Fed. Cir. 2009)) (emphasis added).

Although Commerce did not provide a stand-alone discussion about how CASEAMEX cooperated to the "best of its ability," Commerce explained that it found CASEAMEX's reporting of material factors of production to be in an acceptable manner, under 19 U.S.C. § 1677e(a), such that making an adverse inference under 19 U.S.C. § 1677e(b) was not necessary.  Appx05707.  Contrary to CFA's assertions, Commerce was satisfied with

CASEAMEX's questionnaire responses and Commerce was able to use CASEAMEX's reported packing materials factors of production.  Appx05707; *see also* Appx90263, Appx90316 (CASEAMEX's per unit packing material factors of production included in Commerce's final rate calculation)**.**  Therefore, the Court should sustain Commerce's determination not to apply an adverse inference.  *See id.*; *see also Wheatland Tube*, 161 F.3d at 1369-70.

III.   **Commerce Lawfully Rejected CFA's Ministerial Error Allegation And Its Regulatory Scheme Is Consistent With The Statute**

CFA makes a facial challenge to Commerce's regulatory scheme – 19 C.F.R. §§ 351.224(c)(1), 351.309(c)(2)–requiring ministerial errors present in Commerce's preliminary results to be raised in a party's case briefs to be considered timely raised.  CFA Br. at 10-15.  Specifically, CFA asserts that this regulatory scheme is inconsistent with 19 U.S.C. § 1675(h), which requires Commerce to establish procedures for considering ministerial errors after its final results of administrative reviews.  *Id.*

A facial challenge is a broad-based attack on a statute or regulation's consistency with existing law.  *Parkdale Int'l, Ltd. v. United States*, 508 F. Supp. 2d 1338, 1347 n.5 (Ct. Int'l Trade 2007).  When making a facial challenge to a regulatory policy, "the challenger must establish that no set of circumstances exists under which the {regulation} would be valid." *Id*. (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Further, when ruling on such a challenge, "the agency's construction of the statute is entitled to great weight." *Id*. (citations omitted).  CFA's argument, however, does not adequately consider the congressional intent reflected in the statute, the broader statutory and regulatory context, and decades of reliance by Commerce and other interested parties on the existing scheme.

20

A.     CFA Misinterprets 19 U.S.C. § 1675(h)

On March 25, 2024, CFA submitted ministerial error comments requesting that Commerce make certain changes to CASEAMEX's marine insurance in the calculation of the final results.  Appx90565-90567.  On April 2, 2024, Commerce rejected CFA's ministerial error comments because they were not timely submitted.  Appx05758.  Specifically, pursuant to 19 C.F.R. §§ 351.224(c)(1) and 351.309(c)(2), because the errors were included in the preliminary results and CFA had an opportunity to comment on them in its case brief, Commerce found that the asserted errors should have been raised in CFA's case brief and therefore constituted an untimely ministerial error allegation.  *Id.*; *see* Appx89527, Appx89549, Appx89572 (alleged error in preliminary results); *see also* Appx90399 (alleged error in final results).

CFA argues that Commerce's regulatory scheme, under 19 C.F.R. §§ 351.224(c)(1) ("Comments concerning ministerial errors made in the preliminary results of a review should be included in a party's case brief.") and 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."), is inconsistent with the provisions in 19 U.S.C. § 1675(h).[2]  CFA Br. at 10-15.

Section 1675(h) provides:

> The administering authority shall establish procedures for the
> correction of ministerial errors in final determinations within a

---

[2]  Section 1675(h) specifically enumerates that Commerce shall establish procedures for ministerial errors in "final determinations."  More generally, § 1675 applies to antidumping and countervailing duty administrative reviews, which Commerce's practice refers to as "final results."  Importantly, using the same language, 19 U.S.C. § 1673d(e) and § 1671d(e) directs Commerce to provide the same "procedures" for "final determinations" for antidumping and countervailing duty investigations.  Thus, "final results" are used coterminously with "final determination" throughout this brief.

reasonable time after the determinations are issued under this
section.  Such procedures shall ensure opportunity for interested
parties to present their views regarding any such errors.  As used in
this subsection, the term "ministerial error" includes errors in
addition, subtraction, or other arithmetic function, clerical errors
resulting from inaccurate copying, duplication, or the like, and any
other type of unintentional error which the administering authority
considers ministerial.

Congress explained its rationale for adding subsection (h):

It has come to the Committee's attention that certain final
determinations contain clerical and other errors which are not
corrected, under current procedures, unless the parties to the
proceedings resort to judicial review of the final determination.
The result is expensive litigation that unnecessarily burdens the
court system, in order to correct essentially unintended errors.

*SGL Carbon LLC v. United States*, 819 F. Supp. 2d 1352, 1357 (Ct. Int'l Trade 2012) (citing

H.R. Rep. No. 100-40, Pt. 1, at 144 (1987)).

CFA takes an overly restrictive view of 19 U.S.C. § 1675(h) in two respects.  First, CFA

argues that "{b}y using the word 'shall,' the statute places Commerce under an affirmative

obligation to correct ministerial errors 'in final determinations.'"  CFA Br. at 12.  CFA misstates

the statute.  This statutory provision places an affirmative obligation on Commerce to establish

*procedures* to address ministerial error allegations, which Commerce did by promulgating its

regulations.  In other words, the statute directs Commerce to create a process for parties to

submit arguments about whether errors are indeed "ministerial," within the meaning of 19 U.S.C.

§ 1675(h), before Commerce makes such corrections.  The language does not mandate

Commerce to entertain all allegations of ministerial errors in final results in every circumstance;

but the statute directs Commerce to establish a process for parties to "present their views

regarding any such errors," with the goal of alleviating parties' need to seek judicial review to

remedy such errors.  *See* 19 U.S.C. § 1675(h); *see also Kaiyuan Group Corp. v. United States*,

343 F. Supp. 2d 1289, 1313 (Ct. Int'l Trade 2004) (invoking the parallel statutory scheme for antidumping investigations in 19 U.S.C. § 1673d(e), "Commerce{'s} use of Plaintiff's erroneous translation in making its determination does not convert Plaintiff's mistake into a 'ministerial' error.  Furthermore, because the mistakes in this case were made by the Plaintiff, they are not the type of 'ministerial' errors Congress intended Commerce to correct."); *Chengde Malleable Iron Gen. Factory v. United States*, 505 F. Supp. 2d 1367, 1374 (Ct. Int'l Trade 2007)("{T}he ITA was not required, as a matter of law on the record developed, to amend the Final Results to accommodate Chengde's own admitted error.").

In response, Commerce has created a process to address ministerial errors in its final results.  *See generally* 19 C.F.R. § 351.224; *see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,326 (Dep't of Commerce May 19, 1997) (*Preamble*) ("In response to concerns about needless litigation arising out of lengthy review of ministerial error allegations, the Department has streamlined the disclosure and ministerial error correction process by providing a 30-day time frame for response to ministerial error allegations.").  Even if CFA asserts that the legality of the regulatory scheme has never been questioned, CFA Br. at 12-13, the regulations have been relied upon since 1997 and courts have sustained Commerce's rejection of untimely ministerial error allegations.  *See Preamble,* 62 Fed. Reg. at 27,326; *see also QVD Food, Co. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011) ("Commerce's refusal to make a ministerial correction is not reversible error when the alleged mistake was discoverable during earlier proceedings but was not pointed out to Commerce during the time period specified by regulation."); *Nagase & Co., Ltd v. United States*, 719 F. Supp. 3d 1343, 1355 (Ct. Int'l Trade 2024) ("Nagase submitted such a brief, but it did not object to Commerce's

calculation of the assessment rate.  It was at that point Nagase relinquished its right to object to the data Commerce used." (citations omitted)).

CFA cites *Fine Furniture (Shanghai), Ltd.* and *Ferrosilicon from Brazil* as instances when Commerce addressed certain ministerial errors in its final results.  CFA Br. at 13 (citing *Fine Furniture (Shanghai), Ltd. v. United States*, 182 F. Supp. 3d 1350, 1355 n.3 (Ct. Int'l Trade 2015); *Ferrosilicon from Brazil*, 62 Fed. Reg. 54,085, 54,086 (Dep't of Commerce Oct. 17, 1997) (amended final results)).  These examples are inapposite because the errors were not present in the preliminary results.

Second, CFA argues that Commerce "must allow for the corrections to take place 'within a reasonable time after {final} determinations are issued'" and does not "exclude from its ambit ministerial errors that, while present 'in final determinations,' may also have been present in relevant preliminary determinations."  CFA Br. at 12.  It is not disputed that the statute directed Commerce to establish a process to address ministerial errors "within a reasonable time after the determinations are issued," but the statute does not *foreclose* Commerce's regulatory scheme, that errors–ministerial or non-ministerial–included in the preliminary results, *must* be raised in a party's administrative case brief to the agency before being addressed in the final results.  For example, it is common for Commerce to make certain ministerial or non-ministerial corrections or changes between the preliminary and final results, based on parties' arguments in their case briefs, such that parties are not presented an opportunity to raise any ministerial error comments included in the final results until after Commerce has made such changes, and section § 1675(h) speaks directly to this factual scenario.  Notably, CFA does *not* allege that Commerce's procedures, enumerated in 19 C.F.R. § 351.224, are inadequate to address such errors *exclusively* included in the final results, but CFA takes issue with Commerce's regulatory scheme when

24

errors are present in the preliminary *and* final results.  Section 1675(h) *does not* speak to scenarios where errors are included in Commerce's preliminary results.

Commerce's regulations establish procedures for correction of ministerial errors that are consistent with the statutory requirements and encourage identification and correction of ministerial errors at the earliest opportunity.  Accordingly, the regulation, 19 C.F.R. § 351.224(c)(1), requires interested parties to request in their case briefs correction of ministerial errors that are present in the preliminary results, rather than waiting until after the final results to request the correction.  In contrast, ministerial errors that appear for the first time in the final results, and were not present in the preliminary results, may be corrected if an interested party requests their correction within five days of the disclosure of calculations for the final results.  *Id.* § 351.224(c)(2).

The U.S. Court of Appeals for the Federal Circuit provided the framework for analyzing facial challenges to Commerce's regulations.  *Melamine Chems., Inc. v. United States*, 732 F.2d 924 (Fed. Cir. 1984).  Specifically, the Court held that "{w}hen the issue is the validity of a regulation issued under a statute an agency is charged with administering, it is well established that the agency's construction of the statute is entitled to great weight."  *Id.* at 928 (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978); *Udall v. Tallman*, 380 U.S. 1 (1964)).  Similarly, agency regulations are to be sustained unless unreasonable and plainly inconsistent with the statute, and are to be held valid unless weighty reasons require otherwise.  *Id.* (citing *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1575 (Fed. Cir. 1983)).  Against this backdrop, when evaluating the consistency of a statute and regulatory provisions addressing currency conversions, the Federal Circuit held that, "we detect no disabling conflict between a

regulation applicable to fair value investigations in a special exchange rate situation and a statute governing currency conversions in the assessment and collection of duties." *Id.* at 930.

Section 1675(h) directs Commerce to "establish procedures for the correction of ministerial errors in final determinations within a reasonable time after" the final results such that "interested parties {are able} to present their views regarding any such errors." Section 1675(h) does not require Commerce to consider ministerial error comments only *after* the publication of its final results.  In other words, as directed by the statute, Commerce established a procedure to address ministerial errors found in the *preliminary results*, and an additional procedure to address ministerial errors found in the *final results*.  Similar to the situation in *Melamine Chemicals*, there is no "disabling conflict" between the statute's requirement that Commerce establish procedures to address ministerial errors after the final results, and Commerce's established procedural requirements to address ministerial errors found in the preliminary results.  Indeed, Commerce's *Preamble* to its 1997 promulgation of 19 C.F.R. § 351.224 reflects comity between the statute and regulations:

> One commenter proposed that the regulations clarify that while the Department will not amend preliminary results to correct ministerial errors, it will consider comments concerning ministerial errors made in preliminary results in parties' case briefs.  *The commenter is concerned that the language in the proposed regulation suggests that the Department is prohibited from considering comments concerning ministerial errors until after the final results have been issued.  The Department agrees that the language in the proposed regulation could be misconstrued.  It was not our intention to suggest that the Department would not consider comments concerning ministerial errors made in preliminary results of review during the course of the review.  Rather, we meant only to indicate that the Department will not issue amended preliminary results to correct ministerial errors.*  Therefore, we have adopted the commenter's proposal and have amended the regulation to clarify that we will consider comments concerning ministerial errors made in a preliminary results of a

> review in a party's case brief.  The alleged errors, therefore, will be
> addressed in the final results of review.

*Preamble*, 62 Fed. Reg. at 27,326-27,327 (emphasis added).

Therefore, CFA fails to meet its burden when making a facial challenge to a regulation, and has not established "that no set of circumstances exists under which the {regulation} would be valid."  *Parkdale*, 508 F. Supp. 2d at 1347 n.5 (citing *Salerno*, 481 U.S. at 745).

      B.    <u>Binding Authority Supports Commerce's Regulatory Scheme</u>

          1.    <u>*Loper Bright* Does Not Undermine Commerce's Interpretation Of 19 U.S.C. § 1675(h)</u>

CFA argues that the U.S. Supreme Court's holding in *Loper Bright* undermines Commerce's interpretation of 19 U.S.C. § 1675(h) such that the "best" interpretation of the statute does not "exclude from the statutory directive ministerial errors that, while present 'in final determinations,' may also have been present in relevant preliminary determinations."  CFA Br. at 12-13 (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2224 (2024)).  Indeed, other binding precedent contradict CFA's arguments that 19 C.F.R. §§ 351.224(c)(1) and 351.309(c)(2) are inconsistent with 19 U.S.C. § 1675(h).  CFA is also incorrect with its interpretation of *Loper-Bright*, as we explain below.

Construing the Administrative Procedure Act, 5 U.S.C. § 706, *Loper Bright* overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, courts employed a two-step framework for an agency's interpretation of statutes that Congress entrusted them to administer.  Under step one, a court discerned whether Congress had directly spoken to the precise question at issue, and if congressional intent was clear, that ended the inquiry.  *Loper Bright*, 144 S. Ct. at 2254 (citing *Chevron*).  Under step two, if a court determined that the statute was silent or ambiguous with respect to the specific issue at hand, the

court deferred to the agency's interpretation if it was based on a permissible construction of the statute. *Id*. The courts thus deferred to reasonable agency interpretations of statutory ambiguities or so-called gap-filling. *Chevron*, 467 U.S. at 844.

In *Loper Bright*, the Court held that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 144 S. Ct. at 2273. Although the Court overruled step two of the Chevron framework, in which courts deferred to agencies' reasonable interpretations of silent or ambiguous statutes, the Court held:

> In exercising such judgment, though, courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" consistent with the {Administrative Procedures Act}.

*Id*. at 2262 (quoting *Skidmore v. Swift & Co*, 323 U.S. 134 (1944)). Further, when a statutory ambiguity implicates a technical matter, the Court observed,

> In an agency case in particular, the court will go about its task with the agency's "body of experience and informed judgment," among other information, at its disposal. And although an agency's interpretation of a statute "cannot bind a court," it may be especially informative "to the extent it rests on factual premises within {the agency's} expertise." Such expertise has always been one of the factors which may give an Executive Branch interpretation particular "power to persuade, if lacking power to control."

*Id*. at 2267 (quoting *Skidmore*, 323 U.S. at 140; *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)). Thus, courts are informed by agencies' interpretation and experience with statutes that Congress entrusted them to administer. *See id.*

2.    Commerce Has Inherent And Explicit Authority To Create Rules Of
Agency Procedure

Relevant in this case, 19 U.S.C. §1675(h) expressly delegates to Commerce authority to

"establish procedures for the correction of ministerial errors in final determinations within a

reasonable time after" the final results.  The statute further provides that in establishing such

procedures Commerce "shall ensure opportunity for interested parties to present their views

regarding any such errors."  *Id*.  Consistent with this statutory delegation, Commerce

promulgated regulations for correcting ministerial errors, which ensures that interested parties

have an opportunity to present their view regarding ministerial errors.

The regulatory scheme of 19 C.F.R. §§ 351.224(c)(1) and 351.309(c)(2), requires parties

to raise arguments regarding ministerial or non-ministerial errors included in the preliminary

results in their case briefs, and is undoubtedly a rule of agency procedure.  It ensures that any

such errors are brought to Commerce's attention in an orderly fashion and promptly.  Commerce

possesses authority to impose such procedural requirements both as a general matter and

specifically in furtherance of the agency's implementation the Uruguay Round Agreements Act

(URAA).  *See* Public L. No. 103-465, 108 Stat. 4809, 4864 (1994).  A fundamental principle to

administrative law is that "{a}bsent constitutional constraints or extremely compelling

circumstances the administrative agencies should be free to fashion their own rules of procedure

and to pursue methods of inquiry capable of permitting them to discharge their multitudinous

duties."  *Vt. Yankee Nuclear Power Corp. v. Natural Resources Def. Council Inc.*, 435 U.S. 519,

543 (1978) (cleaned up and quotations omitted).  As the Federal Circuit recently held,

administrative agencies "have the inherent authority to adopt procedures to manage their own

affairs."  *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1261 (Fed. Cir. 2023).

Accordingly, absent constitutional constraints or extremely compelling circumstances, "courts

29

will defer to the judgment of an agency regarding the development of the agency record."

*Dongtai Peak Honey Indus. Co., Ltd. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015)

(quotation omitted).

    *M S International, Inc. v. United States*, 32 F.4th 1145 (Fed. Cir. 2022), provides an

example of the discretion accorded to Commerce in setting procedural requirements that are not

prohibited by statute.  The appellant in that case asserted that, when no deadline was provided by

statute, Commerce could not set a 30-day regulatory deadline.  The Federal Circuit rejected this

argument given the general procedural powers granted to the agency:

> {Appellant} notes that the statute contains no 30-day deadline,
> suggesting that imposing one by regulation contradicts the statute.
> But Commerce may set such deadlines where the statute is silent,
> *Dofasco Inc. v. United States*, 390 F.3d 1370, 1372 (Fed. Cir.
> 2004), and must be permitted to enforce them in order to
> administer the trade remedy laws.

*Id.* at 1153.

    Commerce, therefore, possesses inherent authority to set procedural requirements.  In

addition to that authority, Congress expressly delegated to Commerce the authority to "adopt

'such regulations as may be necessary to ensure that any provision of {the URAA}, or

amendment made by {the URAA}, that takes effect on the date any of the Uruguay Round

Agreements enters into force with respect to the United States is appropriately implemented on

such date.'"  19 U.S.C. § 3513(a)(2).  Congress codified 19 U.S.C. § 1675(h) as part of the

URAA.[3]  *See* Public L. No. 103-465, § 751(g), 108 Stat. 4809, 4864 (1994).  This delegation of

authority is further reinforced by the Statement of Administrative Action's language, which was

---

[3]  The modern day 19 U.S.C. § 1675(h) was included as 19 U.S.C. § 1675(g) in the
URAA.

approved by Congress,[4] providing "{i}n practice, the Administration will endeavor to amend or issue the regulations . . . {19 U.S.C. § 3513(a)(2)} provides the authority for such new or amended regulations to be issued, . . . ."  The Federal Circuit, applying this same statutory framework held that 19 U.S.C. § 3513(a)(2) granted Commerce "regulatory-implementation power" to carry out the URAA.  *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 66 F.4th 968, 977 (Fed. Cir. 2023).

Because Commerce's provisions to address ministerial errors in the preliminary results is not prohibited by 19 U.S.C. § 1675(h), and there are no other constitutional concerns at issue, Commerce lawfully exercised its delegated technical responsibility to "fill up the details" of the Tariff Act of 1930, as amended, when promulgating its statutorily compliant procedural regulations—19 C.F.R. §§ 351.224(c)(1) and 351.309(c)(2).  *See Loper Bright*, 144 S. Ct. at 2263; *see also, e.g.*, *Smith-Corona Grp.*, 713 F.2d at 1582.  The regulatory procedures for correcting ministerial errors, which Commerce promulgated within the bounds of the statutory authority, provide parties with an opportunity to comment on such errors, while encouraging parties to request correction of ministerial errors promptly.

A ministerial error that is present in the preliminary results must be raised in the party's case brief.  19 C.F.R. §§ 351.224(c)(1), 351.309(c)(1)-(2).  If such error is properly raised and substantiated, Commerce will correct it in the final results, if appropriate.  *Id.* § 351.224(e).  Similarly, a ministerial error that was not present in the preliminary results and appears for the first time in the final results, may be corrected after the final results if a party submits comments

---

[4]  Congress expressly approved the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), designating the SAA an "authoritative expression by the United States concerning the interpretation and application of" the URAA.  19 U.S.C. § 3512(d).

on such error within five days of disclosure of the final calculations. *Id.* § 351.224(c)(2). This procedural approach, which encourages parties to seek correction of ministerial errors promptly, is consistent with the statute, well-known to interested parties, and has been accepted and affirmed by courts for decades.

3.      The Principles Of Exhaustion And Finality Provide Legal Support For Commerce's Regulatory Requirements

CFA argues that the "{exhaustion} doctrine is to give the agency the ability to consider issues in the first instance before it is haled into court" and diminishes Commerce's interest in exhaustion because "CFA did raise the relevant issue to the agency." CFA Br. at 14-15. This argument, however, fails to consider Commerce's inherent and explicit authority to create such procedural rules. Indeed, for challenging ministerial or non-ministerial issues in the preliminary results, the prescribed remedy by Commerce is to file a case brief raising the issue. *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F. Supp. 2d 1191, 1205 (Ct. Int'l Trade 2004); *see also* 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."). Inherent to this remedy is the doctrine of administrative exhaustion which holds that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Ta Chen*, 342 F. Supp. 2d at 1205 (citing *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed Cir. 1998) (quoting *McKart v. United States*, 395 U.S. 185, 193 (1969)) (cleaned up)). The regulation, 19 C.F.R. § 351.309(c)(1)-(2) requires that administrative case briefs "present *all* arguments . . . relevant to the Secretary's . . . final results, including any arguments presented before the date of publication of the . . . preliminary results." (emphasis added). This Court has held that the doctrine of exhaustion

32

applies to both ministerial *and* non-ministerial errors. *Ancientree Cabinet Co., Ltd. v. United States*, Court No. 23-00262, Slip Op. 2024-118, 2024 WL 4564174, *9 n. 10 (Ct. Int'l Trade Oct. 24, 2024).

The Supreme Court has explained that the doctrine of administrative exhaustion is well-settled and requires a party to raise issues with specificity and "*at the time appropriate under {an agency's} practice*." *Id.* (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952)) (emphasis added). Requiring exhaustion according to an agency's practice and regulations, both "protect{s} administrative agency authority and promot{es} judicial efficiency." *Id.* (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992))). Thus, 19 C.F.R. § 351.224(c)(1) and § 351.309(c)(2) do not contravene the requirements of 19 U.S.C. § 1675(h); rather, they promote judicial economy and discourage litigation–the same intended congressional goal of 19 U.S.C. § 1675(h). *See* 28 U.S.C. § 2637(d) (requiring exhaustion); *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) ("{E}xhaustion promotes efficiency.").

It follows that the enactment of 19 U.S.C. § 1675(h) and promulgation of 19 C.F.R. § 351.224 addresses Congress's concern to help avoid "needless litigation." Under 19 U.S.C. § 1516a(a), interested parties can seek judicial review of final results, *not the preliminary results*. CFA argues that "Commerce's purpose in administering antidumping duty orders is to determine dumping margins 'as accurately as possible.'" CFA Br. at 10-11 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)). But CFA attempts to distinguish between ministerial errors and substantive claims, which are *also* required to be raised to address issues in the preliminary results under 19 C.F.R. § 351.309(c)(2). *Id.* at 14. This approach disregards Commerce's (and this Court's) interest in finality.

For the purposes of Commerce's proceedings, administrative finality attaches when entries are liquidated, not when the administrative review closes. *Ugine & ALZ Belg., N.V. v. United States*, 517 F. Supp. 2d 1333, 1347 (Ct. Int'l Trade 2007). CFA's interpretation–that Commerce can analyze allegations of *all* ministerial and non-ministerial errors only *after* the final results–is precisely the interpretation that caused great concern and was opposed by some commenters during the promulgation of regulations. *Preamble*, 62 Fed. Reg. at 27,326-27,327. Indeed, CFA's misinterpretation of the statute would put Commerce in a position of having to consider and to address for the first time certain ministerial error allegations after the final results, when such errors would have been corrected earlier under Commerce's current approach. When addressing the competing interests of finality and accuracy, the Federal Circuit has recognized that Commerce's interest in finality could, at a minimum, be equally considered against its interest in accuracy, when error corrections are not raised in a timely manner. *NTN Bearing Corp.*, 74 F.3d at 1208 ("{P}reliminary determinations are 'preliminary' precisely because they are subject to change. Thus, the tension between finality and correctness simply did not exist at the time NTN requested correction {- before Commerce's final results}."); *see also Chengde Malleable Iron Gen. Factory*, 505 F. Supp. 2d at 1374 ("{B}ecause Chengde delayed requesting correction until after the ITA had issued the Final Results, the requirement of administrative finality necessarily outweighed its belated concern for correctness." (citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1352-54 (Fed. Cir. 2006), *reh'g denied*, 2006 U.S. App. LEXIS 10808, *cert. denied*, 549 U.S. 1030 (2006) (distinguishing requests to correct errors at the final-result versus preliminary-result stages)). CFA's proposed interpretation of 19 U.S.C. § 1675(h) would unnecessarily delay the consideration and correction of ministerial errors compared to the regulatory procedure that Commerce has established and

followed for decades.  Commerce's regulatory regime (19 C.F.R. §§ 351.224(c)(1) and

351.309(c)(2)), requiring errors in the preliminary results to be raised in administrative case

briefs (while also creating a process for addressing ministerial errors in final results), is

consistent with 19 U.S.C. § 1675(h), and threads the needle of promoting accuracy and finality in

Commerce's rate calculations, by providing a specific procedural roadmap for parties to raise

ministerial error allegations to Commerce.  *See Civil Aeronautics Board v. Delta Air Lines, Inc.*,

367 U.S. 316, 321-22 n.5 (1961) (explaining that "w}henever a question concerning

administrative, or judicial, reconsideration arises, two opposing policies demand recognition: the

desirability of finality, on the one hand, and the public interest in reaching what, ultimately,

appears to be the right result on the other," and recognizing that "{s}ince these policies are in

tension, it is necessary to reach a compromise").

 In sum, binding Supreme Court and Federal Circuit precedent support the conclusion that

Commerce's regulatory requirements are consistent with 19 U.S.C. § 1675(h).  The principles of

finality and exhaustion, coupled with an inherent and statutory grant of regulatory authority to

create procedural rules further support the lawfulness of 19 C.F.R. §§ 351.224(c)(1) and

351.309(c)(2).  Therefore, the Court should sustain Commerce's rejection of CFA's ministerial

error allegation.

IV. The Court Should Sustain Commerce's Separate Rate Calculation

 Pursuant to 19 U.S.C. § 1675d(c)(5)(A), after excluding other zero and *de minimis*

dumping margins, Commerce assigned CASEAMEX's rate to non-individually examined

companies that Commerce determined were entitled to a separate rate rather than the Vietnam-

wide entity rate of $2.39 per kilogram.  Appx05724-05725.  CFA further argues that because

"remand is required on issues implicating the margin determined for CASEAMEX, CFA submits

that remand of the separate rate is also in order, so that the separate rate may be adjusted if necessary to reflect changes on remand to CASEAMEX's margin." CFA Br. at 16. As discussed above, because CFA fails to identify an error in Commerce's rate calculation for CASEAMEX, no adjustment to CASEAMEX's weighted-average dumping margin is necessary and, thus, there is no basis to remand the calculation of the separate rate. Accordingly, Commerce's separate rate calculation should be sustained.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiff's motion, sustain Commerce's final results, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                              /s/ Kara M. Westercamp
K. GARRETT KAYS                          KARA M. WESTERCAMP
Attorney                                 Senior Trial Counsel
U.S. Department of Commerce              United States Department of Justice
Office of the Chief Counsel for Trade    Civil Division
  Enforcement and Compliance             Commercial Litigation Branch
1401 Constitution Avenue, NW             P.O. Box 480
Washington, D.C. 20230                   Ben Franklin Station
                                         Washington, D.C. 20044
                                         Tel: (202) 305-7571
                                         Email: kara.m.westercamp@usdoj.gov

January 15, 2025                         *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's

Standard Chamber Procedures, and the Court's scheduling order in that it contains 10,301 words,

including text, footnotes, and headings.

<u>/s/Kara M. Westercamp</u>
KARA M. WESTERCAMP

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*,  )<br>  )<br>             Plaintiff,    )<br>  )<br>             v.    )<br>  )<br>UNITED STATES,    )<br>  )<br>             Defendant,    )<br>  )<br>             and    )<br>  )<br>CAN THO IMPORT EXPORT SEAFOOD    )<br>JOINT STOCK COMPANY,    )<br>  )<br>             Defendant-Intervenor.    )<br>  ) | Court No. 24-00082 |

### PROPOSED ORDER

Upon consideration of the plaintiff's motion for judgment upon the agency record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's motion is denied; and it is further

ORDERED that judgment is entered for the United States.

_____
STEPHEN A. VADEN, JUDGE

Dated: _____
New York, NY