## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

CATFISH FARMERS OF AMERICA, *et al.,*

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

CAN THO IMPORT EXPORT SEAFOOD JOINT STOCK COMPANY,

Defendant-Intervenor.

Before: Hon. Stephen Alexander Vaden, Judge

Court No. 24-00082

### PLAINTIFF CATFISH FARMERS OF AMERICA'S REPLY BRIEF

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202)719-7000

*Counsel to the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.*

Dated: March 5, 2025

Ct. No. 24-00082

<u>**TABLE OF CONTENTS**</u>

Page

I.      INTRODUCTION ................................................................................................ 1

II.     ARGUMENT ...................................................................................................... 1

      A.      Commerce's Explanation for its Treatment of CASEAMEX's
            Packing Factors Reporting Remains Inadequate ......................................... 1

      B.      Commerce Erred in Rejecting CFA's Ministerial Error Allegation ....................... 6

            1.      Commerce's procedural authority is limited by the
                 language of the statute ......................................................................... 7

            2.      The statute forecloses a regulatory scheme that prevents
                 parties from addressing ministerial errors in final
                 determinations. .................................................................................. 10

            3.      The regulation is not entitled to deference because of its
                 age. ..................................................................................................... 12

            4.      A regulation that conflicts with a statute is not entitled to
                 any weight. ........................................................................................ 13

            5.      Principles of finality and exhaustion cannot save a
                 regulation that contradicts a statute. .................................................. 14

            6.      The error alleged by CFA is ministerial in nature. ..................... 15

      C.      The Separate Rate Determination Must Be Remanded to Address
            the Ministerial Error ..................................................................................... 16

III.    CONCLUSION .................................................................................................. 16

Ct. No. 24-00082

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Atlantic City Elec. Co. v. F.E.R.C.*,
  295 F.3d 1 (D.C. Cir. 2002) ................................................................................... 7

*Barnhart v. Sigmon Coal Co., Inc.*,
  534 U.S. 438 (2002) ...................................................................................... 13, 14

*Brown v. Gardner*,
  513 U.S. 115 (1994) ...................................................................................... 7, 12

*In re Carter*,
  553 F.3d 979 (6th Cir. 2009) ............................................................................. 7

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
  466 F.3d 134 (D.C. Cir. 2006) ......................................................................... 10

*Decatur v. Paulding*,
  39 U.S. 497 (1840) ........................................................................................... 13

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ......................................................................................... 13

*M S Int'l, Inc. v. United States*,
  32 F.4th 1145 (Fed. Cir. 2022) .......................................................................... 8

*Melamine Chems., Inc. v. United States*,
  732 F.2d 924 (Fed. Cir. 1984) ......................................................................... 13

*Merck & Co., Inc. v. U.S. Dep't of Health & Human Servs.*,
  385 F. Supp. 3d 81 (D.D.C. 2019) ....................................................... 8, 9, 10, 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................... 2, 5

*Nagase & Co., Ltd. v. United States*,
  719 F. Supp. 3d 1343 (Ct. Int'l Trade 2024) ................................................... 12

*NLRB v. Fin. Inst. Employees of Am., Local 1182*,
  475 U.S. 192 (1986) ............................................................................... 8, 9, 11, 12

*NTN Bearing Corp. v. United States*,
  74 F.3d 1204 (Fed. Cir. 1995) ......................................................................... 11

Ct. No. 24-00082

*Public Employees Retirement Sys. of Ohio v. Betts*,
    492 U.S. 158 (1989)................................................................................12, 14

*QVD Food Co., Ltd. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)..................................................................12

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002)......................................................................................9

*Randell Warehouse of Ariz., Inc. v. N.L.R.B.*,
    252 F.3d 445 (D.C. Cir. 2001)....................................................................5

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990)..................................................................6

*Royal Brush Mfg., Inc. v. United States*,
    75 F.4th 1250 (Fed. Cir. 2023) ..................................................................8

*Rubin v. United States*,
    449 U.S. 424 (1981)....................................................................................6

*SGL Carbon LLC v. United States*,
    36 CIT 264, 819 F. Supp. 2d 1352 (2012) ....................................11, 15

*Texas v. EPA*,
    726 F.3d 180 (D.C. Cir. 2013)....................................................................7

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952)....................................................................................14

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978)....................................................................................8

**Statutes**

19 U.S.C. § 1675................................................................................................10

19 U.S.C. § 1675(h)..........................................................................................12

19 U.S.C. § 3513(a)(2)........................................................................................9

**Regulations**

19 C.F.R. § 351.224(c)(1)....................................................................................7

Ct. No. 24-00082

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*,
   62 Fed. Reg. 27, 296 (Dep't Commerce May 19, 1997) ..........................................................9

**Other Authorities**

Trade and International Economic Policy Reform Act of 1987, H.R. Rep. No.
   100-40, Pt. 1 (1987) ...................................................................................................6, 11, 15

The Tariff Act of 1930 ........................................................................................... *passim*

Ct. No. 24-00082

## I.   INTRODUCTION

On behalf of the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA"), we respectfully submit this brief in reply to the responses filed by Defendant the United States ("Defendant") and Defendant-Intervenor Can Tho Import Export Seafood Joint Stock Company ("CASEAMEX").  *See* Def. Resp. to Pl.'s Mot. for J. on the Agency R. (Jan. 15, 2025), ECF No. 29 ("Def. Resp."); CASEAMEX Resp. in Opp. to Pl.'s Mot. for J. on the Agency R. (Feb. 5, 2025), ECF No. 30 ("CASEAMEX Br.").

## II.   ARGUMENT

### A.   Commerce's Explanation for its Treatment of CASEAMEX's Packing Factors Reporting Remains Inadequate

In the final results, the Department of Commerce ("Commerce") refused to apply adverse facts available to CASEAMEX's treatment of its packing factors on grounds that "Commerce never instructed CASEAMEX to report the materials" used to pack the merchandise for shipment beyond the United States "in a supplemental questionnaire."   Appx05707. Commerce's rationale directly contradicts the record evidence—as the United States itself concedes. *See* Def. Resp. at 12 (acknowledging that Commerce "requested the {packing} data in the revised manner" to "cover packing costs for all destinations").

In the underlying administrative review, CASEAMEX reported the "amount of the relevant packing materials specifically consumed to pack one kilogram of the subject merchandise shipped to the United States during the POR," even though Commerce instructed

1

Ct. No. 24-00082

CASEAMEX to report the materials used in producing and packing goods of the type shipped to the United States "inclu{sive of} that portion of the production that was not destined for the United States."  Appx81858, Appx81886; Appx02143, Appx02171.   CFA pointed out that CASEAMEX's response was "problematic," because "there are no grounds for CASEAMEX to limit its reporting to only the materials used for shipments to the United States."  Appx82316-82317; Appx02375-02376.  CFA asserted that the resulting record gap required CASEAMEX to supplement its reporting.   Specifically, CFA proposed that Commerce issue a supplemental questionnaire instructing CASEAMEX to "resubmit {its} FOP database to include PackType FOPs that incorporate all packing materials . . . regardless of whether those packing materials were used for shipments to the United States."  Appx 82317; Appx02376.  Commerce agreed, issuing a supplemental questionnaire reproducing verbatim CFA's proposed instruction, thereby making pellucid the requirement that CASEAMEX submit packing FOPs "*regardless of whether those packing materials were used for shipments to the United States*."  Appx84462; Appx04360 (emphasis added).  CASEAMEX ignored this command and "continue{d} to report its packing information based on the packing types for the MUC sold to the U.S. market."  *Id.*  Given these clear record facts, Commerce's explanation for refusing to apply adverse facts available—namely, that Commerce never asked CASEAMEX to provide packing FOPs regardless of whether the materials were used for shipments to the United States—"runs counter to the evidence" and thus runs afoul of the substantial evidence standard.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Commerce disagrees, primarily on grounds that there is no "gap" in the agency record and, thus, neither facts otherwise available nor adverse inferences are appropriate here.  Def.

Ct. No. 24-00082

Resp. at 12-20.  CASEAMEX joins the government in this, and all other, arguments, and CFA responds to both parties together.  CASEAMEX Br. at 6.

The defense's contention fails because it rests on the flawed premise that Commerce did not seek packing information for shipments beyond the United States.  Specifically, Commerce argues that its "initial request for information" only sought "packing costs/labor associated with *shipments to the United States.*" Def. Resp. at 13; *see also id.* at 14 (asserting that Commerce "declined to further pursue information regarding global packing expenses").  Commerce accordingly asserts that there is no basis to apply facts otherwise available, *id.*, or to conclude that CASEAMEX failed to cooperate to "the best of its ability" in responding to Commerce's requests for information—a prerequisite to applying adverse facts, *id.* at 18.  CASEAMEX agrees and adds that CFA fails to delineate between the statutory provisions governing the use of "facts otherwise available" and those governing the use of adverse facts.  CASEAMEX Br. at 7-8.  Both parties are incorrect, and CASEAMEX's further argument misses the mark because Commerce's basis for refusing to apply adverse facts and its basis for refusing to apply facts otherwise available both flow from the same factual error.

Commerce's initial request sought "factors information . . . including that portion of the production that was not destined for the United States."  Appx81858; Appx02143.  When CASEAMEX responded with data limited to shipments to the United States, Commerce issued a supplemental questionnaire demanding that CASEAMEX "resubmit your FOP database to include PACKTYPE FOPs" for "all packing materials . . . *regardless of whether those packing materials were used for shipments to the United States.*"  Appx84462; Appx04360 (emphasis added).  CASEAMEX refused to do so.  *See id.* ("CASEAMEX continues to report its packing information based on the packing types for the MUC sold to the U.S. market.").  CASEAMEX

3

concedes this point, acknowledging that it decided to continue reporting "packing factors based on U.S. sales rather than global sales," based on its misunderstanding of Commerce's initial question despite the clarity of Commerce's supplemental request.  CASEAMEX Br. at 9. Commerce did not, and has not, grappled with CASEAMEX's failure to heed this request because Commerce did not, and has not, explained how CASEAMEX's provision of U.S. data adequately responded to a request for global information.  Instead, Commerce attempts to rewrite the record by asserting that it only ever asked for information regarding U.S. shipments, notwithstanding its reiteration of its request for global reporting in a supplemental questionnaire.

The remainder of Commerce's arguments regarding the sufficiency of CASEAMEX's responses are likewise unavailing because they amount to no more than *post hoc* justifications for the conclusion Commerce reached and otherwise misstate the record.  First, Commerce asserts that there is no gap on the record because CASEAMEX "reported its *total* amount of packing factors . . . and *per-unit* amount used . . . to produce one unit of the merchandise under consideration destined to the United States."  Def. Resp. at 13.  This mischaracterizes the record, which reflects that CASEAMEX provided a list of its packing material suppliers, Appx81984; Appx02247, and that CASEAMEX otherwise limited its reporting to the U.S. market, Appx84461; Appx04359 (explaining that CASEAMEX "traced all packing types used for its U.S. sales" and "weigh{ed} samples to determine the per-unit amount of each material used"), Appx88810-88811; Appx04889-04890 (multiplying weight per unit by US sale quantities to determine "weighted average based on all pack types").  More to the point, Commerce's argument before this Court does not reflect the explanation Commerce provided in its final determination, namely, that CASEAMEX properly reported its packing data because Commerce "never instructed" it to report global data.  Appx05707.

Ct. No. 24-00082

Commerce also argues that its stated "preference to calculate normal value based on a company's production costs . . . for both home and third-country markets," which is set forth in a policy bulletin, "cannot override the {underlying} statute, which limits the relevant adjustment to packing expenses for shipments to the U.S. market," and that the policy is in any event inapplicable in this case since CASEAMEX only has one factory.  Def. Resp. at 15.  These explanations fail for the simple reason that Commerce did not raise them in rendering its final decision.  *See* Appx05707.  If Commerce wants to argue that its policy runs afoul of the Tariff Act of 1930 (the "Tariff Act"), or that its policy does not apply to the facts of this case, it is free to do so on remand.   But the government cannot transform Commerce's inadequate determination into a properly supported one through *post hoc* rationalizations.

Commerce finally contends that it has discretion to decide whether a party adequately replies to requests for information and whether to apply adverse facts, and that it exercised that discretion here to determine that the packing data provided by CASEAMEX sufficed and that CASEAMEX had cooperated to the best of its ability with Commerce's investigation.  Def. Resp. at 13, 18-19.  This argument overlooks that Commerce expressly tied its determination that CASEAMEX's reporting was "acceptable" to the demonstrably false assertion that "Commerce never instructed CASEAMEX to report the materials otherwise in a supplemental questionnaire." Appx05707.  That error renders Commerce's explanation insufficient.  *See State Farm*, 463 U.S. at 43.  Compounding the problem, as Commerce essentially concedes, the final results do not include any "stand-alone discussion about how CASEAMEX cooperated to the best of its ability."  Def.'s Resp. at 19 (internal quotations omitted).  It is thus impossible to determine how Commerce reached its admittedly unstated conclusion that CASEAMEX was sufficiently cooperative despite ignoring Commerce's explicit reporting instructions.  *See e.g., Randell*

Ct. No. 24-00082

*Warehouse of Ariz., Inc. v. N.L.R.B.*, 252 F.3d 445, 449 (D.C. Cir. 2001) ("{W}ithout some explanation of how the Board reached its conclusion, we have no basis in the record upon which to evaluate whether the Board's {decision} is rational, based on substantial evidence, and consistent with the Board's own precedents." (quotations omitted)).   Accordingly, the final results must be remanded with instructions that Commerce explain the basis for concluding that CASEAMEX cooperated to the best of its ability with the investigation in light of the fact that CASEAMEX ignored Commerce's direct and repeated request for global packing data.

### B.    Commerce Erred in Rejecting CFA's Ministerial Error Allegation

Section 1675(h) of the Tariff Act states that Commerce "shall establish procedures for the correction of ministerial errors *in final determinations* within a reasonable time after the determinations are issued under this section.  Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors."   19 U.S.C. § 1675(h) (emphasis added).  By its plain terms, the statute requires Commerce to enable interested parties to seek corrections to *final determinations* after issuance.  This requirement is consistent with the "basic purpose" of the statute, which is to "determin{e} current margins as accurately as possible."   *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).   It is likewise consistent with Congress's intent in enacting the provision, which was to avoid "judicial review of {a} *final determination*" as the sole means of correcting "clerical and other errors" in "*final determinations*."   Trade and International Economic Policy Reform Act of 1987, H.R. Rep. No. 100-40, Pt. 1, at 144 (1987) ("Rep. 100-40") (emphasis added).   CFA respectfully submits that the best interpretation of the statute is that it means what it says, *i.e.*, that Commerce must allow interested parties to seek corrections to a *final determination* after a *final determination* is issued.  *See, e.g. Rubin v. United States*, 449 U.S. 424, 431 (1981) (rejecting

Ct. No. 24-00082

interpretation that conflicted with plain meaning and purpose of statute); *In re Carter*, 553 F.3d 979, 986 (6th Cir. 2009) (explaining that courts interpret statutes by looking first to the statutory text and, only if that is unclear, considering legislative history, policy rationales, and context).

But the regulation that Commerce crafted to implement 19 U.S.C. § 1675(h) conflicts with its plain text, its overarching purpose, and the congressional intent behind the statute. Specifically, the implementing regulation states that Commerce will not correct a ministerial error in a final determination if that error was also present in a preliminary determination, unless the error was raised in a party's case brief. 19 C.F.R. § 351.224(c)(1); *see also id.* § 351.309(c)(2). Insofar as the regulation purports to allow Commerce to ignore a request to fix a ministerial error present in a final determination, it conflicts with the statute and, thus, cannot stand. *See, e.g., Brown v. Gardner*, 513 U.S. 115, 120 (1994) ("{T}he text and reasonable inferences from it give a clear answer against the Government{'s regulatory interpretation} and that, as we have said, is the end of the matter." (internal quotations omitted)); *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013) ("A valid statute always prevails over a conflicting regulation, and a regulation can never trump the plain meaning of a statute." (internal quotations and citations omitted)); *Atlantic City Elec. Co. v. F.E.R.C.*, 295 F.3d 1, 11 (D.C. Cir. 2002) (agency "cannot rely on one of its own regulations to trump the plain meaning of a statute").

In its response brief, the government advances a litany of counter arguments in defense of Commerce's regulation, but none withstand scrutiny for the simple reason that all ignore the statutory text, purpose, and context of Section 1675(h).

## 1.    Commerce's procedural authority is limited by the language of the statute.

First, Defendant argues that Commerce has inherent and express authority to establish whatever rules of procedure it sees fit to implement Section 1675(h). Def. Resp. at 29-31. But

"{e}ven broad rulemaking power must be exercised within the bounds set by Congress." *Merck & Co., Inc. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019). As a result, Commerce does not have the authority to enact any procedural rule it sees fit; rather, such rules must comport with the authority granted by Congress through the Tariff Act. *See NLRB v. Fin. Inst. Employees of Am., Local 1182*, 475 U.S. 192, 201-02 (1986) (rejecting argument that Board required a "wide degree of discretion in establishing the procedure and safeguards necessary" to fulfill statutory mandate because "the question . . . is whether the Board's new rule exceeds the Board's statutory authority.").

As a result, the cases that Defendant cites in support of Commerce's rule are inapposite. In *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978), there was no question that the agency acted within the confines of its enabling statute. *See id.* at 535 (explaining agency "employed all the procedures required by" the relevant statute "and more"). The case thus addressed a different question than that presented here, namely whether an agency must "employ procedures *beyond* those required by the statute." *Id.* at 524 (emphasis added). Here, the question is whether a regulation that precludes consideration of ministerial errors in final determinations comports *with* the requirements of a statute aimed at correcting such errors in final determinations without judicial intervention.

*Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023) and *M S Int'l, Inc. v. United States*, 32 F.4th 1145 (Fed. Cir. 2022), are likewise inapplicable. The former case relied on *Vermont Yankee* for the unremarkable proposition that U.S. Customs and Border Protection has "inherent authority to utilize protective orders." *Royal Brush Mfg.*, 75 F.4th at 1260. The latter case states that Commerce can set a regulatory deadline when none exists in the statute. *M S Int'l*, 32 F.4th at 1153. Neither observation displaces the bedrock rule that an

agency's "interest in insuring the integrity of its procedures does not empower it to adopt measures exceeding its statutory authority." *NLRB*, 475 U.S. at 207. Thus, the starting point to determine whether Commerce exceeded its authority in adopting its implementing regulation is the text of section 1675(h).

The text of the statute likewise answers Defendant's assertion that Commerce's regulation is valid because the agency is authorized to "adopt such regulations as may be necessary" to implement the statute. Def. Resp. at 30-31 (internal quotations omitted). Congress gave the agency express authority to "issue such regulations . . . as may be necessary to ensure that any provision of {the Tariff Act} . . . is appropriately implemented." 19 U.S.C. § 3513(a)(2). But regulations cannot plausibly be deemed necessary—or appropriate—where they contradict the purpose of the statutory provisions they purport to implement. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86, 88 (2002) (invalidating a regulation the agency described as "necessary to carry out the Act" because it was "contrary to the Act's remedial design" (internal quotations omitted)). Commerce "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *See id.* at 91 (internal quotations omitted); *see also Merck*, 385 F. Supp. 3d at 92.

Commerce points to the preamble to its regulations to establish "comity between the statute and the regulations." Def. Resp. at 26. The preamble indicates that, in promulgating its regulation, Commerce did not intend "to suggest that {it} would not consider comments concerning ministerial errors made in preliminary results of review during the course of the review," and had amended the regulation "to clarify that we will consider comments concerning ministerial errors made in a preliminary results of a review in a party's case brief." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27, 296, 27,326-27 (Dep't Commerce May 19,

Ct. No. 24-00082

1997).  This argument misses the mark.  The question here is not whether Commerce can also address ministerial errors in preliminary results as a mechanism for avoiding errors in final results.  Rather, it is whether Commerce can decline to address ministerial errors in final results that were also present in preliminary results if a party fails to raise the ministerial errors in its case brief.  As explained, the answer to that question must be no, because the statute plainly requires Commerce to establish a procedure to avoid wasteful litigation and ensure accurate results by enabling parties to raise ministerial errors in *final determinations* after such determinations are issued.

> **2.     The statute forecloses a regulatory scheme that prevents parties from addressing ministerial errors in final determinations.**

Next, Commerce argues that 19 U.S.C. § 1675 obligates the agency "to establish *procedures* to address ministerial error allegations," but "does not mandate Commerce to entertain all allegations of ministerial errors in final results in every circumstance" and, thus, "does not *foreclose* Commerce's regulatory scheme that errors—ministerial or non-ministerial— included in the preliminary results, *must* be raised in a party's administrative case brief to the agency before being addressed in the final results."  Def. Resp. at 22, 24, 31 (emphasis in original).  According to Commerce, its regulation is thus "consistent with the statutory requirements," even though the regulation prevents parties from addressing ministerial errors in final determinations in some circumstances.  *Id.* at 24-25; *see also id.* at 31.

This is incorrect.  It is well-established that "{a}n agency's general rulemaking authority plus statutory silence does not . . . equal congressional authorization."  *Merck*, 385 F. Supp. 3d at 92.  Nor does a delegation of "general rulemaking authority . .  mean that the specific rule the agency promulgates is a valid exercise of that authority."  *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006).  Rather, an agency must always

Ct. No. 24-00082

exercise its authority in a manner that is consistent "with the administrative structure that Congress enacted into law." *Merck*, 385 F. Supp. 3d at 92; *see also NLRB*, 475 U.S. at 207 (agency's "interest in insuring the integrity of its procedures does not empower it to adopt measures exceeding its statutory authority").

Here, "the administrative structure that Congress enacted into law," *Merck*, 385 F. Supp. 3d at 92, requires Commerce to "establish procedures for the correction of ministerial errors *in final determinations* within a reasonable time after the determinations are issued," 19 U.S.C. § 1675(h) (emphasis added). The text does not express any intent to exclude ministerial errors that were present in both final determinations and preliminary determinations. *Id.* Nor does the legislative history reflect such an intent. Rep. 100-40 at 144. Rather, that history repeatedly references errors in *final determinations*. *Id.* This history is fully consistent with the underlying statutory purpose, which is to determine margins that are "as accurat{e} as possible." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (internal quotations omitted). By refusing to consider requests to correct ministerial errors in final determinations that were also present in preliminary determinations unless a party raised the error in a case brief, Commerce places an additional burden on parties that is not contemplated by the statutory text and that is inconsistent with the statute's purpose and congressional intent. The statute charges Commerce to create and administer a procedure to eliminate "mindless and mechanistic mistakes," *SGL Carbon LLC v. United States*, 36 CIT 264, 274, 819 F. Supp. 2d 1352, 1363 (2012), in final determinations without the need for judicial intervention, *see* 19 U.S.C. § 1675(h); Rep. 100-40 at 144. The statute does not give Commerce authority to demand that interested parties follow other procedures—like raising a ministerial error in a case brief after

Ct. No. 24-00082

receipt of a preliminary determination—as a prerequisite to eliminating such errors from final determinations. *See NLRB*, 475 U.S. at 204.

**3.    The regulation is not entitled to deference because of its age.**

Defendant also asserts that Commerce's regulation is entitled to deference because its legality "has never been questioned" and it has been "relied upon since 1997." Def. Resp. at 23. But as the Supreme Court has emphasized, "{a} regulation's age is no antidote to clear inconsistency with a statute{.}" *Gardner*, 513 U.S. at 122 ("{W}e dispose of the Government's argument that the VA's regulatory interpretation of § 1151 deserves judicial deference due to its undisturbed endurance for 60 years."). "Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with the statutory language." *Public Employees Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989). Because the regulation "flies against the plain language of the statutory text," courts are "exempt{} . . . from any obligation to defer to it." *Gardner*, 513 U.S. at 122.

Defendant additionally points out that courts "have sustained" the agency's "rejection of untimely ministerial error allegations," relying in particular on *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011) and *Nagase & Co., Ltd. v. United States*, 719 F. Supp. 3d 1343, 1355 (Ct. Int'l Trade 2024). Def. Resp. at 23-24. But these cases assumed that Commerce's regulations were lawful. *See generally QVD Food*, 658 F.3d 1318; *Nagase*, 719 F. Supp. 3d 1343. Neither discuss the regulation's conformity with 19 U.S.C. § 1675(h)'s language or purpose. *See generally QVD Food*, 658 F.3d 1318; *Nagase*, 719 F. Supp. 3d 1343 These decisions thus do not establish any meaningful judicial review of Commerce's regulation and do not "enhance any claim to deference." *Gardner*, 513 U.S. at 122.

Ct. No. 24-00082

4.      **A regulation that conflicts with a statute is not entitled to any weight.**

Commerce further asserts that its interpretation of the statute is entitled to "great weight" under Federal Circuit precedent, and that agency regulations must "be sustained unless unreasonable and plainly inconsistent with the statute."   Def. Resp. at 25 (quoting *Melamine Chems., Inc. v. United States*, 732 F.2d 924, 928 (Fed. Cir. 1984)).   According to Commerce, *Loper Bright* does not change this analysis since, in that case, the Supreme Court held that courts may "seek aid from the interpretations of those responsible for implementing particular statutes." *Id.* at 28 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)).

Commerce's attempt to sidestep *Loper Bright* falters.  *Loper Bright* clarified that when, as here, "the meaning of a statute {is} at issue, the judicial role {is} to interpret the act of Congress, in order to ascertain the rights of the parties."  *Loper Bright*, 603 U.S. at 385-86 (internal quotations omitted) (quoting *Decatur v. Paulding*, 39 U.S. 497, 515 (1840)).  In fulfilling this mandate, the court must apply its own judgment and "set aside any {agency} action inconsistent with the law as {the courts} interpret it."  *Id.* at 391-92.  Judicial independence in statutory interpretation matters because "agencies have no special competence in resolving statutory ambiguities.  Courts do."  *Id.* at 400-01.  Thus, the court must "interpret statutes, no matter the context, based on the traditional tools of statutory construction," in an effort to identify "the best" reading of the statute.  *Id.* at 400, 403.  In undertaking this exercise, the court's singular goal is "always, to independently interpret the statute and effectuate the will of Congress{.}"  *Id.* at 395.

In interpreting a statute, the court starts with the statutory text.  *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002).  Here, the text of the statute requires Commerce to "establish procedures for the correction of ministerial errors in final determinations within a

reasonable time after the determinations are issued under this section."  19 U.S.C. § 1675(h).

The Act thus unambiguously requires Commerce to establish a procedure that facilitates the

review and correction of such mistakes in a final determination.  The Act's terms are moreover

consistent with the legislative intent to avoid needless litigation over ministerial mistakes and the

overarching statutory goal of ensuring accurate margins.  Because "the statutory language is

unambiguous and the statutory scheme is coherent and consistent," there is no need to defer to

Commerce's contrary interpretation.  *Barnhart*, 534 U.S. at 450 (internal quotations omitted).

And because Commerce's interpretation is at odds with the statutory text, "no deference is due to

{it}."  *Betts*, 492 U.S. at 171.

     **5.**      **Principles of finality and exhaustion cannot save a regulation that contradicts a statute.**

Commerce next argues that principles of exhaustion and finality support its regulation.

*See* Def. Resp. at 32-33.  This argument rests on the flawed premise that Commerce has

"inherent and explicit authority" to issue the regulation.  *Id.* at 32.  But as explained above,

Commerce's procedural authority is circumscribed by the Tariff Act.  Commerce thus cannot

rely on this authority to enact a regulation that ignores the statutory language and frustrates the

statutory purpose or congressional will.

Moreover, exhaustion principles are inapposite here.  Those principles exist to ensure that

an agency "has opportunity for correction in order to raise issues reviewable by the courts."  *See*

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952).  But Congress enacted

section 1675(h) to *avoid* raising ministerial issues before the courts precisely because no

substantive judgment is required to correct such errors beyond confirming that they exist.  In any

event, CFA did raise the relevant issue to the agency within the time frame that the agency itself

Ct. No. 24-00082

designated for raising ministerial errors affecting final determinations. Commerce had the opportunity to address CFA's argument in the first instance.

Importantly, ministerial errors are "mindless and mechanistic mistakes." *SGL Carbon*, 36 CIT at 274, 819 F. Supp. 2d at 1363; *see also* Rep. 100-40 at 144. They accordingly do not relate to any substantive or methodological choice made by the agency. Correcting errors of this type places minimal burdens on the agency. More to the point, the statute at issue here clearly and directly requires the agency to consider, and rectify, ministerial errors without burdening the courts.

### 6. The error alleged by CFA is ministerial in nature.

CASEAMEX adopts the Government's arguments and adds that the error alleged by CFA is not ministerial in nature. CASEAMEX Br. at 12-13. Specifically, CASEAMEX argues that the error identified by CFA was intentional and, thus, not ministerial. *Id.* at 13. CASEAMEX's argument is both incorrect and irrelevant. It is incorrect because CFA identified a conversion error affecting the calculation of the surrogate value for marine insurance. Appx90565-90567; Appx05745-05747. Such a mathematical mistake falls squarely within the definition of a ministerial error under the statute. *See* 19 U.S.C. § 1675(h). In any event, CASEAMEX's argument is irrelevant because the issue before the court is whether Commerce can issue a regulation that purports to authorize the agency to refuse to correct a ministerial error despite the plain language of the statute demanding that Commerce provide a procedure for correcting such errors in final determinations. As explained above, the answer to that question is no and, accordingly, the Court should remand Commerce's treatment of CFA's ministerial error allegation for consideration consistent with the language, context, and purpose of the

Ct. No. 24-00082

Section 1675(h).  On remand, CASEAMEX and Commerce are free to dispute the nature of the error alleged.

      **C.**     **<u>The Separate Rate Determination Must Be Remanded to Address the Ministerial Error</u>**

The ministerial error alleged by CFA bears upon the separate rate, which was based entirely on the margin calculated for CASEAMEX.  Appx90565-90567; Appx05745-05747. Because remand is required on issues implicating the margin determined for CASEAMEX, a remand of the separate rate is also in order so that the separate rate may be adjusted if necessary to reflect changes on remand to CASEAMEX's margin.

**III.**    **<u>CONCLUSION</u>**

For the foregoing reasons, CFA respectfully requests that the Court remand Commerce's decision not to employ an adverse inference with respect to CASEAMEX's packing factors reporting, the agency's rejection as untimely of CFA's ministerial error allegation, and commerce's determination of the separate rate.

Ct. No. 24-00082

Respectfully submitted:

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.


**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000


*Counsel to the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.*

Dated: March 5, 2025

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement.  The word count for the Catfish Farmers of America's Comments in Support of Remand Redetermination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,751 words.


_/s/ Nazak Nikakhtar_
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

Catfish Farmers of America, et al.
(Representative Of)

March 5, 2025
(Date)