A-552-801
Remand
Slip Ops. 25-152; 25-153
POR:  08/01/2021 – 07/31/2022
~~**Business Proprietary Document**~~
E&C/OV:  JB

*Public Version*

**Catfish Farmers of America, et. al. v. United States Ct. No. 24-00082, Slip Op. 25-152 (CIT December 15, 2025) and *Luscious Seafood LLC v. United States* Ct. No. 24-00069, Slip Op. 25-153 (CIT December 15, 2025)**
**Certain Frozen Fish Fillets from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the opinions and remand orders of the U.S. Court of

International Trade (the Court) in *Catfish Farmers of America, et. al. v. United States* Ct. No. 24-

00082, Slip Op. 25-152 (CIT December 15, 2025) (*25-152 Remand Opinion*) and *Luscious

Seafood LLC v. United States* Ct. No. 24-00069, Slip Op. 25-153 (CIT December 15, 2025) (*25-

153 Remand Opinion*).  These final results of redetermination concern the *Final Results* in the

2021-2022 administrative review of the antidumping duty order on certain frozen fish fillets

from the Socialist Republic of Vietnam[1] covering the period of review (POR) August 1, 2021,

through July 31, 2022.[2]

In the above-referenced remand opinions, the Court found certain aspects of Commerce's

*Final Results* not supported by substantial evidence.  In the *25-152 Remand Opinion*, the Court

found that Commerce improperly rejected a ministerial error allegation as untimely, and it

---

[1] *See Notice of Antidumping Duty Order:  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 FR 47909 (August 12, 2003) (*Order*).
[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results and Partial Rescission of Administrative Review; 2021-2022*, 89 FR 18595 (March 14, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

directed Commerce to accept the allegation and make corrections, as necessary, on remand.[3]  In

the *25-153 Remand Opinion*, the Court found that Commerce's determination that Luscious

Seafood LLC (Luscious Seafood) did not have standing as a wholesaler of domestic like product

during the POR was not supported by substantial evidence, and it directed Commerce to reassess

its standing determination.[4]

Below, we provide further discussion of these issues and have modified certain aspects of

our analysis, consistent with the Court's orders.  First, under respectful protest,[5] we have

provided further explanation of our determination regarding Luscious Seafood's standing to

request review as a wholesaler of domestic like product.  As part of this analysis, we have

reopened the record to solicit select information for which the Court indicated that Commerce

did not provide Luscious Seafood adequate opportunity to provide corrective/clarifying

information.

Second, under respectful protest,[6] we have accepted the ministerial error allegation as

directed, and we have revised the dumping margin calculated for mandatory respondent Can Tho

Import Export Seafood Joint Stock Company (Caseamex).  We have also applied this revised

rate to the four companies receiving separate rates in this administrative review:  Cafatex

Corporation (Cafatex); Hung Vuong Corporation[7] (HVG); International Development and

Investment Corporation (IDI); and Loc Kim Chi Seafood Joint Stock Company (Loc Kim).

---

[3] *See 25-152 Remand Opinion* at 35.
[4] *Id.* at 24.
[5] *See Viraj Group v. United States*, 343 F.3d 1371 (Fed. Cir. 2003) (*Viraj*).
[6] *Id.*
[7] Hung Vuong Corporation (also known as Hung Vuong Joint Stock Company, HVC or HV Corp.) is part of a single entity with the following companies:  (1) An Giang Fisheries Import and Export Joint Stock Company (also known as Agifish, An Giang Fisheries Import and Export, An Giang Fisheries Import & Export Joint Stock Company); (2) Asia Pangasius Company Limited (also known as ASIA); (3) Europe Joint Stock Company (also known as Europe, Europe JSC or EJS CO.); (4) Hung Vuong Ben Tre Seafood Processing Company Limited (also known as Ben Tre, HVBT, or HVBT Seafood Processing); (5) Hung Vuong Mascato Company Limited (also known as Mascato); (6)

## II.    BACKGROUND

### A. Commerce's *Preliminary Results*[8]

On September 7, 2023, Commerce published the *Preliminary Results* of the 2021-2022 administrative review of the *Order*.  In the *Preliminary Results*, which incorporated the findings made in our Standing Memorandum,[9] we preliminarily determined that Luscious Seafood did not have standing to request review during this POR as a wholesaler of domestic like product.[10] Specifically, we considered various factors in making this finding, including  that:  (1) the company has a limited history with respect to conducting business operations and little record-keeping; (2) the company did not produce certain documentation requested by Commerce; and (3) the company's reporting contained inconsistencies regarding certain basic information, such as start dates for its operations and identification of key personnel.[11]  As a result, we concluded:

> we note that it is critically important to resolve issues of standing as early as possible in a review.  Here, we have already issued two questionnaires providing {the company} the opportunity to establish its standing, and it was unable to do so. Accordingly, we intend to immediately treat {its} review request as void, and proceed accordingly.[12]

Accordingly, we signaled our intent to rescind the review with respect to any company that was under review solely based on Luscious Seafood's review request.[13]

---

Hung Vuong—Sa Dec Co., Ltd. (also known as Sa Dec or Hung Vuong Sa Dec Company Limited); and (7) Hung Vuong—Vinh Long Co., Ltd. (also known as Vinh Long or Hung Vuong Vinh Long Company Limited).

[8] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Notice of Intent to Rescind, in Part; 2021-2022*, 88 FR 61525 (September 7, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

[9] *See* Memorandum, "Luscious Seafoods Standing to Request Review," dated January 27, 2023 (Standing Memorandum).

[10] *See Preliminary Results* PDM at 6.

[11] *See* Standing Memorandum at 3-4.

[12] *Id*. at 5.

[13] *See Preliminary Results* PDM at 6.

Regarding mandatory respondent CASEAMEX, Commerce preliminarily calculated a margin of $0.14/kilogram (kg) for the company.[14]  As part of that calculation, Commerce deducted marine insurance from CASEAMEX's U.S. prices.  In our formula, we intended to compute marine insurance by multiplying the applicable surrogate marine insurance rate by gross U.S. price; however, instead, we incorrectly deducted the marine insurance rate itself.[15]  No party commented on this in case briefs.

### B. Commerce's *Final Results*

In the *Final Results*, our conclusion regarding Luscious Seafood was unchanged.  We continued to find that the company did not demonstrate that it had standing to request review during the POR.[16]  As part of our final analysis, we continued to rely on the facts stated above:[17]

> Here, we examined information relating to various criteria in our analysis.  These considerations included the company's limited history and timing of its establishment, the limited number of transactions during the POR, and the extent to which those limited transactions reflected a commercially reasonable and sustainable business activity.  We also noted that Luscious Seafood{} failed to provide, at our explicit request, certain information (relating to the company's banking) as well as various business documents, which we deemed relevant to our analysis.  Further still, Luscious Seafood{'s} various responses contained inconsistencies with respect to the timing of its initial activity and the personnel involved in the company's operations.  These factors are meaningful, especially given the context of the company as a first-time participant in the proceeding.

We also acknowledged, in a limited fashion, the statutory *bona fides* criteria that Commerce applies most frequently in new shipper reviews and in administrative reviews:[18]

> There are a wide variety of factors that Commerce considers in determining whether commercial activities are *bona fide* in other contexts, and we find our approach in such circumstances to be instructive here.  In any case, Luscious

---

[14] *See Preliminary Results*, 88 FR at 61526.
[15] *See* Memorandum, "Preliminary Results Analysis Memorandum for Can Tho Import Export Seafood Joint Stock Company," dated August 31, 2023 (CASEAMEX Preliminary Analysis Memorandum).
[16] *See Final Results* IDM at Comment 1 (footnotes omitted).
[17] *Id*.
[18] *Id*. (footnote enumerating the factors omitted).

Seafoods' implication that there must be an exclusive list of factors that Commerce considers (or may not consider) in its analysis is without merit.

Accordingly, we rescinded the review with respect to four companies that were under review solely based on Luscious Seafood's review request:  Bien Dong Hau Giang Seafood Joint Stock Company; Bien Dong Seafood Company Ltd. (Bien Dong); NTSF Seafoods Joint Stock Company (NTSF); and PREFCO Distribution LLC.[19]

Additionally, in the *Final Results*, we made certain changes to the margin calculation for CASEAMEX, resulting in a margin of $0.18/kg.  However, we continued to calculate marine insurance in the same manner as in the *Preliminary Results*.[20]

Following the *Final Results*, the petitioners[21] brought a ministerial error allegation regarding our calculation of marine insurance.  Because the alleged error related to an aspect of the calculation that was present in the *Preliminary Results* and on which no party had commented in its case brief, we rejected the allegation as untimely.[22]  We explained that:

> {p}ursuant to 19 CFR 351.224(c)(1), comments concerning ministerial errors in the preliminary results of a review should be included in a party's case brief. Moreover, 19 CFR 351.309(c)(2) states that a party's 'case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results....'  The alleged ministerial error referenced in your submission was discoverable earlier in the proceeding (*i.e.*, immediately following the preliminary results) but was not pointed out to Commerce during the time period specified by our regulations (*i.e.*, in the petitioners' case brief).[23]

---

[19] *See Final Results*, 89 FR at 18597-98 (denoting companies under review by Luscious Seafood's request with three asterisks).  The Vietnam-wide entity was covered by the Luscious Seafood request.

[20] *See* Memorandum, "Final Results Analysis Memorandum for Can Tho Import Export Seafood Joint Stock Company," dated March 5, 2024 (CASEAMEX Analysis Memorandum).

[21] The petitioners are the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.

[22] *See* Commerce's Letter, "Rejection of Untimely Ministerial Error Allegation," dated April 2, 2024.

[23] *Id*.

Therefore, we made no changes to our final calculations for CASEAMEX.  This litigation ensued.

### C.  The Court's Remand Opinions

The Court remanded two aspects of Commerce's *Final Results*, relating to:  (1) our treatment of Luscious Seafood's assertion of standing, and (2) our rejection of the ministerial error allegation as untimely.

Regarding our examination of Luscious Seafood's standing, the Court indicated that Commerce's application of a *bona fide* test was improper.  It explained:

> Commerce did not define what it meant when it used the term "*bona fide*" wholesaler.  The literal translation of the Latin term is "good faith."

> Commerce did not point to, or base its decision on, record evidence that Luscious Seafood's business transactions during the POR were fraudulent, deceitful, or otherwise made on a false pretense.  As a result, {Commerce}'s decision lacks finding or reasoning under which Luscious Seafood's business transactions during the POR were not made in good faith.[24]

Thus, the Court found that Commerce's decision was not based on evidence that the company failed to act in good faith but, rather, was improperly focused on the limited/new operations of the company.[25]  For similar reasons, the Court also found that Commerce failed to justify its reliance on the statutory *bona fides* criteria applied in new shipper reviews.[26]  It stated that, in a new shipper review, "the prices in a U.S. sales or sales form the basis for the new shipper's rate, {and} Commerce must ensure that the sales price or prices are not based on artifice or collusion" whereas, here, "Luscious Seafood does not seek an individual rate for itself as a foreign exporter

---

[24] *See 25-153 Remand Opinion* at 12-13.
[25] *Id*. at 13.
[26] *Id*. at 14.

or producer but instead claims a need for protection from unfairly traded imports."[27]  Thus, Commerce improperly did not explain how the new shipper factors were relevant here.

Second, the Court determined that Commerce's conclusions regarding Luscious Seafood were not supported by substantial evidence.  The Court identified each of the factual underpinnings for Commerce's determination, and it found that either the identified deficiencies were insignificant or that Commerce could have issued additional questionnaires to resolve any inconsistencies in Luscious Seafood's submissions.[28]

Regarding our rejection of petitioners' ministerial error allegation, the Court found that we improperly considered the allegation to be untimely.[29]  Specifically, the Court determined that, regardless of Commerce's practice and the agency's reading of the applicable regulation, Commerce is required to address ministerial errors identified and raised by interested parties following the issuance of the final results—regardless of whether the party could have identified and commented on these errors in its case brief.[30]

---

[27] *Id*. at 15.

[28] In particular:  (1) Commerce found troubling that the company did not have a current business license on hand – the Court found that this was not significant and noted that the company stated it was attempting to acquire a copy; (2) Commerce requested copies of bank statements from the company, and Luscious Seafood sent screenshots instead – the Court held that response was adequate, and Commerce could have followed up with another questionnaire, if necessary; (3) Commerce noted that there was a discrepancy in the company's reporting as to the start date of operations, *i.e.*, 2021 vs 2022 – the Court said that was adequate, and Commerce could have followed up, if necessary; and (4) Commerce emphasized that there was a discrepancy in the company's identification of Luscious Seafood's company personnel, whereby it failed to identify (at least) one employee – the Court found that it was a mistake, and again noted that Commerce could have followed up.

[29] *See 25-152 Remand Opinion* at 34.  The Court affirmed Commerce's decision not to apply adverse facts available regarding CASEAMEX's reporting of its packing factors of production data.  *Id.* at 17.

[30] *Id.* at 17-35.

7

On March 11, 2026, Commerce issued its Draft Results.[31]  On March 23-24, 2026, the petitioners, Luscious Seafood, CASEAMEX, Bien Dong, and NTSF submitted comments on the Draft Results.[32]

### III.    ANALYSIS

Pursuant to the Court's remand opinions, we provide discussion of our determinations regarding:  (A) Luscious Seafood's review request, and (B) our treatment of the petitioners' ministerial error allegation, in turn.

### A.  Luscious Seafood's Review Request

Pursuant to the Court's opinion regarding Luscious Seafood,[33] we have reviewed the record information regarding Luscious Seafood and solicited select information on remand.  We now provide, under respectful protest,[34] further explanation of our decision regarding the company's standing to request review in this POR.  We continue to determine that Luscious Seafood did not establish standing as an interested party during this POR and, accordingly, treat its review request as invalid.

#### 1.   The Bona Fides Standard

As noted above, the Court indicated that Commerce applied an incorrect standard in analyzing Luscious Seafood's claims of status as a domestic wholesaler in this proceeding.  The

---

[31] *See* Draft Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et. al. v. United States*, Ct. No. 24-00082, Slip Op. 25-152 (CIT December 15, 2025) and *Luscious Seafood LLC v. United States*, Ct. No. 24-00069, Slip Op. 25-153 (CIT December 15, 2025), issued March 11, 2026 (Draft Results).

[32] *See* Petitioners' Letter, "Comments on Draft Remand Results – Ministerial Error Issue," dated March 23, 2026, 2024 (Petitioners' March 23, 2026 Comments); CASEAMEX's Letter, "Comments on Remand Ct. No. 24-00082," dated March 23, 2026 (CASEAMEX's Comments); and Bien Dong/NTSF's Letter, "Comments on Draft Results of Redetermination," dated March 23, 2026 (Bien Dong/NTSF's Comments).  *See also* Petitioners' Letter, "Comments on Draft Remand Results – Luscious Seafood Issue," dated March 24, 2026, 2024 (Petitioners' March 24, 2026 Comments); and Luscious Seafood's Letter, "Comments on Draft Remand Determination," dated March 24, 2026, 2024 (Luscious Seafood's Comments).

[33] *Id.* at 12-15.

[34] *See Viraj*, 343 F.3d. 1371.

Court held that, absent evidence of bad faith, Commerce must find Luscious Seafood's operations are sufficient to qualify for standing; specifically, it ruled that "what Commerce described as its 'considerations' are not directed to whether the business transactions were made in good faith but instead pertain generally to how well-established Luscious Seafood was as an enterprise during the POR."[35]  Thus, the Court directed Commerce to limit its analysis to whether the company acted in bad faith or conducted fraudulent activities before disqualifying Luscious Seafood from establishing standing.

As explained in further detail below, we have complied with the Court's order. Specifically, we have examined anew whether Luscious Seafood's claim that it is a domestic wholesaler was supported with sufficient evidence.  After considering the evidence on the record, we continue to find that the evidence does not support this claim, given that:  (1) the company made only a single, unprofitable sale during the POR, under a business license that was valid for only 39 days; (2) the documents proffered to support that claim contain discrepancies which call into question when and how that single sale was made; and (3) the sale involved an individual who has significant ties to a company involved in the importation of Vietnam fish. Further, Luscious Seafood appears to have attempted to intentionally mislead Commerce in a number of instances, both when describing its operations and when supplying data to support that description.

Because the Court faulted Commerce for not defining "*bona fide*" in its determination, we provide additional explanation of the term at this time.  As an initial matter, we agree with the Court that it would be inappropriate to focus exclusively on how established an enterprise is when determining whether that company was a *bona fide* domestic wholesaler.  Where we

---

[35] *See 25-152 Remand Opinion* at 13.

disagree is whether such considerations should be part of the analysis at all, and if they should,

how to take them into account when examining the totality of the circumstances surrounding that

analysis.

The broader goals of any *bona fides* determination, *i.e.*, to ensure that operations/sales are

"typical of commercial transactions" and "commercially reasonable,"[36] are relevant to our

analysis because such criteria can be fundamental to understanding whether a party has a

legitimate and ongoing interest in the proceeding.  As the Court noted, here, Luscious Seafood

"claim{ed} a need for protection from unfairly traded imports"[37] in its review request.  Our

consideration of the *bona fides* of the company's operations is designed to evaluate that claim,

rather than merely to accept it.  Commerce must be satisfied that a party requesting a review has

a legitimate commercial interest in the proceeding prior to dedicating agency resources to

conduct such a review.  At a minimum, a party must be able to show that it has a stake in

assessment of duties on the imports which are subject to its request.  A party cannot simply claim

a "need for protection" from imports against which it does not compete in order to satisfy the

standard.  A host of information sought in our questionnaires to Luscious Seafood – *e.g.*, whether

the company has the necessary licenses to conduct business in the future, whether the company is

affiliated with other parties that are subject to the *Order* – are all relevant to this inquiry.  Thus,

our analysis is directly related to Luscious Seafood's stated interest and motivation for

participating in the underlying review.

The Court found Commerce's application of the above-referenced standard to be

unlawful and further found that the phrase "*bona fide*" in this context should be understood to

---

[36] *See Tianjin Tiancheng Pharm. Co. v. United States*, 366 F.Supp.2d 1246, 1249-50 (2005); and *Shandong Chenhe Int'l Trading Co. v. United States*, Slip Op. 10-129, at 5 (CIT November 22, 2010).
[37] *See 25-153 Remand Opinion*, at 15.

mean "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine."[38]  For the reasons

stated, we respectfully disagree that "*bona fide*" should have a different and more limited

meaning in this context as compared with elsewhere throughout Commerce's practice.

Nonetheless, as further discussed below in the section titled "Additional Requests for

Information and Application of Court's *Bona Fide* Standard," we do not find that Luscious

Seafood's reporting meets this even less stringent standard or otherwise demonstrates "good

faith" participation in this proceeding.

2.  *Application of Bona Fides Standard in Underlying Review*

We respectfully disagree that our initial analysis was inconsistent with administrative

practice, the statutory framework, or jurisprudence on *bona fides* analyses.  In numerous cases,

including in this proceeding, we have required companies to demonstrate that they have

legitimate POR operations to ensure that they are entitled to qualify as domestic interested

parties.[39]  Although Commerce has noted that the bar is a low one,[40] and we frequently do afford

parties standing when they demonstrate legitimate wholesaling operations, this does not warrant

a conclusion that a company must be afforded standing despite an inability to support its claim at

the most basic level.  Commerce must evaluate *bona fides* based on an objective assessment of

---

[38] *Id*. at 12.

[39] *See, e.g., Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 36102 (July 8, 2021) (*Vietnam Fish 18-19*), and accompanying IDM at Comment 1 ("Both CBBC and QMC have submitted sufficient evidence of the *bona fide* nature of their sales of domestic like product"); and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 15912 (March 21, 2022) (*Vietnam Fish 19-20*), and accompanying IDM at Comment 1 ("As an initial matter, and as noted above, Commerce solicited information regarding the *bona fide* nature of CBBC's wholesaling transactions").

[40] Regarding interested party status, the Court has observed that "{t}he legislative history of the domestic interested party provision states that 'standing requirements should be administered to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." *See Brother Indus. (USA), Inc. v. United States*, 801 F.Supp.751, 757 (1992) (quoting S. Rep. No. 96-249, 96th Cong., 1st Sess. 63 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 449) (internal citation and alteration omitted).

the facts, not by inquiring into the subjective intent of the party.[41]  As discussed in the following section, the facts surrounding Luscious Seafood's wholesaling activities do not provide objective evidence demonstrating *bona fide* operations; this conclusion is only further supported by the conflicting information that the company provided during the administrative proceeding and on remand.

Regarding the statutory framework setting forth the *bona fides* criteria used in new shipper reviews, as noted above, we did not rely on these criteria when performing our analysis of Luscious Seafood's standing as a domestic wholesaler; rather, we merely found that Commerce's consideration of these specific criteria in other contexts supported the analysis otherwise undertaken here.[42]  We acknowledge the Court's conclusion that not all of the *bona fides* criteria are equally applicable to this case because Luscious Seafood does not seek a margin calculation for itself; indeed, this is beyond dispute.  Where we disagree, however, is whether Commerce should be precluded from considering *any* of these criteria when conducting its analysis of Luscious Seafood's standing.

In our final results, we found that the discrepancies in Luscious Seafood's reporting were significant.  Luscious Seafood was unable to provide evidence that it had a business license covering the entirety of the POR; instead, the record now shows that it was licensed only for 39 days of the POR (*i.e.*, for a portion of May, and all of June, 2022).[43]  Further, its commercial

---

[41] *See M.Z. Berger & Co., Inc. v. Swatch AG,* 787 F.3d 1368, 1376 (Fed. Cir. 2015) (finding, in the context of a trademark proceeding, that "{t}he use of the term 'bona fide' is meant to . . . require, based on an objective view of the circumstances, a good faith intention to eventually use the mark in a real and legitimate commercial sense" and noting that "{t}he Board may make such determinations on a case-by-case basis considering the totality of the circumstances").

[42] *See Final Results* IDM at Comment 1 ("There are a wide variety of factors that Commerce considers in determining whether commercial activities are *bona fide* in other contexts, and we find our approach in such circumstances to be instructive here").

[43] *See* Luscious Seafood's Letter, "Supplemental Questionnaire Response," (Luscious Seafood December 30, 2022 SQR) at Exhibit 1.  Moreover, as further detailed below, it has now come to light that:  (1) Luscious Seafood did not

activity during the POR was limited to a single sale on which it made no profit,[44] and it provided no evidence that it had attempted to make additional sales during the POR;[45] thus, its commercial activity provided little basis to support its claim that it was a domestic wholesaler operating as a going concern.

Against this backdrop, it is even more significant that Luscious Seafood provided initially incomplete banking documentation and reported inconsistent information regarding the individuals involved in the company's operations.[46] Basic information regarding personnel should be readily available to the company; moreover, the identity of a second individual performing work on the company's behalf was not reported by Luscious Seafood and, instead, was brought to light after other interested parties provided rebuttal factual information and comments to contradict Luscious Seafood's reporting.[47] This type of fundamental failure calls into question the accuracy of its responses and the company's willingness to be forthright in responding to official requests for information.

We appreciate the Court's concern that Commerce did not follow up with additional supplemental questionnaires and we have now afforded Luscious Seafood two further opportunities to explain any inconsistent information. That said, we note that standing is a

---

have a business license for about six months after its initial and short-term ([   ] days) business license expired; and (2) it did not have a wholesaling or other business license when it requested a review in the instant case in August 2022, despite its implied claim to the contrary.

[44] *See* Luscious Seafood December 30, 2022 SQR at 5-6.

[45] *See* Luscious Seafood October 25, 2022 SQR at 4. While Luscious Seafood did, ultimately, renew its business license, it seems to have only done so after we asked for a copy of it, rather than for the purpose of making additional sales. *See* Luscious Seafood's Letter, "Supplemental Questionnaire Response," dated February 12, 2026 (Luscious Seafood February 12, 2026 SQR), at 1.

[46] *See* Standing Memorandum at 3-4; *see also 25-153 Remand Opinion*, at 11-12.

[47] *Compare* Luscious Seafood December 30, 2022 SQR at 6, *with* Bien Dong Seafood Co., Ltd (Bien Dong)/NTSF Seafoods Joint Stock Company (NTSF)'s Letter, "Rebuttal Factual Information to Luscious Seafood's Wholesaler Supplemental Questionnaire Response," dated January 12, 2023 (Bien Dong/NTSF January 12, 2023 RFI), at 6 and RFI-3 (noting that an invoice referenced an individual other than Luscious Seafood's purported sole employee as a contact; observing that a phone number associated with Luscious Seafood belonged to an individual other than the one reported employee).

foundational issue in Commerce's proceedings, and it can have implications for major case decisions, such as respondent selection and identifying which companies are under review.[48] Thus, it is imperative that we can resolve questions of standing as quickly as feasible. Here, we determined that the need to resolve the issue early in the review was of paramount importance, given the number of decisions that necessarily flowed from it. In this regard, we initiated this review in October 2022,[49] issued questionnaires to Luscious Seafood (and the other company that asserted standing as a wholesaler of domestic like product) in October and December,[50] and then issued a standing memorandum in January 2023.[51] We believe that these procedures were consistent with Commerce's goal of the timely administration of its proceedings, and issuing multiple questionnaires to a party to assist it in resolving reporting discrepancies regarding basic information, such as business licensure or the individuals involved in the company's operations, inhibit that goal.

Finally, we note that our finding that Luscious Seafood did not have standing as a domestic wholesaler was not made in the context of facts available, with its statutory requirement that we must afford a party an opportunity to correct its reporting when deficiencies are present.[52] Rather, Commerce found that Luscious Seafood did not demonstrate its entitlement to standing in this segment of the proceeding based on the evidence that Luscious Seafood provided to support its claim.

---

[48] Section 351.213(b) of Commerce's regulations allows a domestic interested party, including petitioners and wholesalers of domestic like product, to request a review of all exporters as long as they are named.
[49] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 61278, 61281-84 (October 11, 2022).
[50] *See* Commerce's Letters, "Questionnaire for Luscious Seafood," dated October 14, 2022; and "Supplemental Questionnaire for Luscious Seafood," dated December 13, 2022 (December 13, 2022 Supplemental Questionnaire).
[51] *See* Standing Memorandum.
[52] *See* sections 776(a) and 782(d) of the Tariff Act of 1930, as amended (the Act).

*3.  Additional Requests for Information and Application of Court's Bona Fides Standard*

As noted above, we are mindful of the Court's finding that Commerce should have provided the company an additional opportunity to respond in the underlying segment prior to making a negative finding based on discrepant information.  Therefore, we reopened the record on remand to permit Luscious Seafood to provide corrective or clarifying information relating to various deficiencies we identified.[53]  The company's responses to our questionnaires are discussed below.

With regard to the company's business license, as noted above, Luscious Seafood informed Commerce that "it requested a copy of the updated business license covering the end of the POR, but {Luscious Seafood} stated that the license was not available in time to include with the company's response."[54]  Therefore, we afforded Luscious Seafood an additional opportunity to provide this business license on remand.  In response, the company notified Commerce for the first time that it did not, in fact, have a business license during a large portion of the POR, stating that "{t}hough Luscious{Seafood} did not have a license covering [      ] – December 2022, it has no effect on whether Luscious was a legitimate business."[55]  Thus, it was not that Luscious Seafood *could not* obtain a copy of the license in time, but, rather, that it simply *did not* have one during this period of time.  It appears that it was only after Commerce asked Luscious Seafood (on December 13, 2022) for all state filings from inception to present[56] that Luscious applied for the "updated" business license that was issued on December 27, 2022,[57] but said that it could not

---

[53] *See* Commerce's Letters, "Luscious Seafood Supplemental Questionnaire," dated February 9, 2026 (February 9, 2026 Supplemental Questionnaire); and "Luscious Seafood Second Supplemental Questionnaire," dated February 18, 2026 (February 18, 2026 Supplemental Questionnaire).
[54] *See* Luscious Seafood December 30, 2022 SQR at 1.
[55] *See* Luscious Seafood February 12, 2026 SQR at 1.
[56] *See* Luscious Seafood December 13, 2022 Supplemental Questionnaire.
[57] *See* Luscious Seafood February 12, 2026 SQR.

include in time for its December 30, 2022 SQR filing.[58]  Given this situation, we find that Luscious Seafood deliberately attempted to obfuscate the situation, rendering its compliance with Commerce's requests neither sincere, genuine, nor made in good faith.

Equally concerning is the documentation that Luscious Seafood submitted to support its standing claim.  In the recent supplemental questionnaires issued on remand,[59] we also solicited additional information relating to the timing of Luscious Seafood's first sale, as well as the identity and role of additional individuals involved in this transaction.  During the course of our reexamination of the record with respect to this aspect of our inquiry, we discovered, for the first time, that two copies of the invoice that Luscious Seafood proffered to document its sole sale during the POR were not identical in all respects.  In particular, we noted that one of these invoices was dated [                    ]; this is the invoice cited by Luscious Seafoods in the narrative portion of its submission as supporting its sale.[60]  However, we also noted that the record contains what appears to be a second signed invoice for this same sale, with a different date, [            ].[61]

When asked about this apparent discrepancy, Luscious Seafood stated that "{t}he invoice dated [                ] was the *pro forma* invoice created manually by Luscious {Seafood} using a template and should not have been included in Luscious {Seafood's} 12/30/22 {supplemental questionnaire response}."[62]  However, this explanation appears to be belied by other documentation elsewhere on the record.  Significantly, among the sales negotiation documents that Luscious Seafood submitted is an email from Luscious Seafood to its customer, [

---

[58] *See* Luscious Seafood December 30, 2022 SQR.
[59] *See* February 9, 2026 Supplemental Questionnaire; and February 18, 2026 Supplemental Questionnaire.
[60] *See* Luscious Seafood October 25, 2022 SQR at Exhibit 4.
[61] *See* Luscious Seafood December 30, 2022 SQR at Exhibit 6.
[62] *See* Luscious Seafood Letter, "Second Supplemental Questionnaire Response," dated February 20, 2026 (Luscious Seafood February 20, 2026 SQR).  A *pro forma* invoice is a preliminary invoice sent to a buyer in advance of shipment to confirm the details of the sale.

], dated [                    ] (*i.e.*, one week after the date of the alleged *pro forma* invoice); in this email, Luscious Seafood asked [      ] for its contact information.  Shortly thereafter, on [                    ], [      ] provided its address and phone number.  This email exchange calls into question Luscious Seafood's explanation because the [                ] invoice already reflected all of [          ] contact information; were Luscious Seafood's explanation genuine, there would have been no need for the company to ask its customer for information already in its possession.  Thus, Luscious Seafood's explanation -- that this duplicate invoice was simply a *pro forma* invoice -- does not reconcile with the sales negotiation history.  It also bears noting that the [                ] invoice predates the reported sales contract covering the sole transaction between Luscious Seafood and its customer (by eight days).[63]  These discrepancies further undermine the reliability of the company's reporting.

We also asked Luscious Seafood in a new supplemental questionnaire about the role of the second individual involved in the company, who appears on the freight forwarding shipping invoice provided by the company.  Specifically, we asked:  "Please explain in detail who [          ] is, including his full name, as well as all roles and duties performed during and after the POR for Luscious Seafood."[64]  Luscious Seafood provided a response stating:  "[          ] is [                                  ] was helping [          ] as a mentor in her new business."[65]  As discussed above, and in our Standing Determination, we noted that [          ] appeared to play a significant role in the sale, and in the company itself, given that:  (1) he was a contact listed on a shipping invoice,[66] (2) his contact information was associated with the

---

[63] *See* Luscious Seafood October 25, 2022 SQR at Exhibit 4.
[64] *See* February 9, 2026 Supplemental Questionnaire, at 4.
[65] *See* Luscious Seafood February 12, 2026 SQR at 3.
[66] *See* Luscious Seafood December 30, 2022 SQR at Exhibit 6.

company's business license,[67] and (3) he ultimately became the owner of Luscious Seafood.[68] Moreover, the bank documentation provided during this remand segment shows that [          ] was listed as a party on the bank documentation associated with one of the accounts used by Luscious Seafood during the POR.[69]  Further, Luscious Seafood provided no rebuttal or explanation concerning the factual information on the record indicating that the individual in question is also affiliated with another company involved in the sale of subject merchandise.[70] Given the failure to provide a complete response to our question, including any disclosures of affiliations with the individual in question and his potentially pivotal involvement in this sale, we again cannot conclude that Luscious Seafoods' response was either sincere or genuine; rather, it appears more as an additional attempt to omit and obfuscate.

Thus, we continue to find that Luscious Seafood failed to provide a complete and accurate response to our questions.  In fact, despite being provided two other opportunities to provide information to Commerce on remand, the record only further supports our finding that Luscious Seafood's reporting is not reliable and, accordingly, that the company has not established standing in this review.  Further, given the wide range of omissions, irregularities, and discrepancies in the company's reporting—including issues for which Luscious Seafood has now had multiple opportunities to provide reliable reporting—we do not find that Luscious Seafood's request for review and corresponding documentation can be characterized as

---

[67] *Compare* Luscious Seafood December 30, 2022 SQR, at 6, *with* Bien Dong/NTSF January 12, 2023 RFI, at 6 and RFI-3.

[68] *See* Luscious Seafood February 12, 2026 SQR at 3.

[69] *See* Luscious Seafood's Letter, "Supplemental Questionnaire Response – Part II," dated February 19, 2026, at Exhibit RS-1 (showing both [                              ] and [                              ] on the bank statements starting in [                 ]).  Luscious Seafood characterized this account as "the accounted used before Luscious' business account was opened correctly." *Id*. at 1.  This documentation shows that [              ] was added to this account in February 2022 (*i.e.*, during the POR). *Id*. at Exhibit RS-1.

[70] Bien Dong/NTSF provided evidence that [          ] was associated with [                    ], one of the largest importers/exporters of subject merchandise from Vietnam to the United States.  *See* Bien Dong/NTSF January 12, 2023 RFI at 6 and Exhibit RFI-3.

"{s}incere" or "genuine."[71]  The company has offered, in more than one instance, conflicting or implausible explanations for its reporting deficiencies.  Further, Luscious Seafood provided squarely incorrect information; for instance, concerning its business license, the company stated that a copy of the "license… was not available in time" for its response when, in fact, it simply did not have a license covering the period in question.

Accordingly, when applying the standard directed by the Court, we continue to find that Luscious Seafood does not have standing to request a review in this POR.  Regardless of which definition of the term *bona fide* is applied, when requesting information to administer the antidumping and countervailing duty laws, there is an even more fundamental principle at work: Commerce must be able to trust the documentation upon which it relies in performing its analyses.  Luscious Seafood's reporting throughout this proceeding does not permit Commerce to do so.  We do not find it appropriate to presume "good faith" in the face of such repeated and blatant inaccuracies and conflicting statements on the record.

## B.  Consideration of the Petitioners' Ministerial Error Allegation

Pursuant to the Court's directive, we have analyzed the petitioners' ministerial error allegation and have made certain modifications to the margin analysis.  The calculation methodology applied on remand is discussed below.

In the underlying review, we preliminarily calculated marine insurance for CASEAMEX by deducting the fixed expense rate, based on a surrogate value (SV), rather than multiplying that insurance rate by gross unit price.[72]  No party commented on this in the case briefs filed after the *Preliminary Results*, and we continued to calculate marine insurance in the same manner for the

---

[71] *See 25-153 Remand Opinion*, at 12.

[72] *See* Memorandum, "Preliminary Results Analysis Memorandum for Can Tho Import Export Seafood Joint Stock Company," dated August 31, 2023.

*Final Results*.  Following the final results, the petitioners brought a ministerial error allegation regarding our calculation of marine insurance, which we rejected as untimely.[73]

On remand, having accepted the petitioners' ministerial allegation pursuant to the Court's directive, we provided parties an opportunity to comment on the substance of the ministerial error allegation.[74]  CASEAMEX, Bien Dong, and NTSF filed comments,[75] in which they argue that:  (1) Commerce should reject the petitioners' ministerial error allegation because it does not meet the threshold definition of a "ministerial" error within the meaning of 19 CFR 351.224(f), given that Commerce made an intentional methodological choice in calculating CASEAMEX's marine insurance;[76] (2) the petitioners failed to allege any unintentional error and that simply pointing to SAS programming language is insufficient;[77] (3) Commerce's calculation documents show clearly that Commerce intended to calculate marine insurance as a per-unit amount in dollars per kilogram;[78] and (4) applying marine insurance as a percentage of price would grossly overstate the amount of marine insurance.[79]

Pursuant to the Court's directive, and under respectful protest, we have accepted the petitioners' ministerial error allegation.  We agree that the allegation identified an error that was

---

[73] *See* Commerce Letter, "Rejection of Untimely Ministerial Error Allegation," dated April 2, 2024.

[74] *See* Memorandum, "Reconsideration of Ministerial Error Allegation," dated December 18, 2025.

[75] *See* CASEAMEX's Letter, "Can Tho Import Export Seafood Joint Stock Company Rebuttal to Petitioners' Ministerial Error Allegation," dated December 22, 2025 (CASEAMEX December 22, 2025 Rebuttal Ministerial Error Comments); and Bien Dong/NTSF's Letter, "NTSF and BDSF's Rebuttal to Petitioners' Ministerial Error Allegation," dated December 23, 2025 (Bien Dong/NTSF December 23, 2025 Rebuttal Ministerial Error Comments) (citing HVG's Letter, "Hung Vuong Group Rebuttal to Petitioners' Ministerial Error Allegation," dated April 1, 2024 (HVG April 1, 2024 Ministerial Error Rebuttal Comments)).

[76] *See* CASEAMEX December 22, 2025 Rebuttal Ministerial Error Comments at 4.

[77] *Id.* at 2; Bien Dong/NTSF December 23, 2025 Rebuttal Ministerial Error Comments; and HVG April 1, 2024 Ministerial Error Rebuttal Comments at 2.

[78] *See* CASEAMEX December 22, 2025 Rebuttal Ministerial Error Comments at 3 (citing Memorandum, "Surrogate Values for Preliminary results," dated August 31, 2023 (Preliminary Results Surrogate Value Memorandum) at 8); Bien Dong/NTSF December 23, 2025 Rebuttal Ministerial Error Comments; and HVG April 1, 2024 Ministerial Error Rebuttal Comments at 2-3 (citing Preliminary Results Surrogate Value Memorandum at 8).

[79] *See* CASEAMEX December 22, 2025 Rebuttal Ministerial Error Comments at 3-4; Bien Dong/NTSF December 23, 2025 Rebuttal Ministerial Error Comments; and HVG April 1, 2024 Ministerial Error Rebuttal Comments at 3.

ministerial in nature, and we have revised the dumping margin calculated for mandatory respondent CASEAMEX; we have also assigned this rate to the companies receiving a separate rate. Regarding the basis of the marine insurance SV, after further review, we determine that this SV is not expressed as a per-unit amount as we had intended, but rather it is a ratio which is expressed as a percentage of value.[80] The underlying source for this rate (RJG Consultants) states that the insurance rate to be applied is based on a percentage of a dollar value.[81] Thus, we agree that this SV should be multiplied by the gross unit price in order to calculate an accurate marine insurance expense. Accordingly, we are now computing marine insurance expense by applying the ratio to the gross unit price.[82] Furthermore, we are not inflating this source, as there is no need to inflate SVs that are presented as ratios because they are applied to contemporaneous prices.[83]

In the course of correcting the above error, we discovered an additional error in the calculation of marine insurance which we are now also correcting. Specifically, CASEAMEX's marine insurance variable in its U.S sales database was not being properly read by the SAS programming language in the margin program due to a formatting issue.[84] Accordingly, Commerce added language to the SAS margin program to properly read in CASEAMEX's marine insurance factor of production.[85] As a result of these changes, we have calculated a revised margin of $0.20/kg for CASEAMEX.

---

[80] *See* Vinh Hoan Corporation, CASEAMEX, and the Vietnam Association of Seafood Exporters and Producers' Letter, "Surrogate Values," dated April 21, 2023 (Respondents April 21, 2023 SV Submission), at Exhibit SV-14.
[81] *Id*. ("The rates are based on per $100.00 Value, … Insured Value Is 110% of total shipment value.").
[82] *Id*.
[83] *See* Memorandum, "Analysis of CASEAMEX for the Draft Results of Redetermination," dated concurrently with these draft results of redetermination (Draft Results Analysis Memorandum).
[84] *Id*.
[85] *Id*.

21

While we have complied with the Court's direct instruction, we respectfully disagree that our rejection of CASEAMEX's ministerial error allegation was improper.  As the Court has acknowledged, Commerce's regulations require parties to identify ministerial errors in case briefs following the preliminary results of a review.[86]  This regulation ensures that parties identify errors at an appropriate time in a segment such that there is sufficient opportunity for Commerce to consider interested party comments on any alleged errors and to correct them, where warranted, in our final calculations.  This prevents parties from deliberately waiting to identify errors until the conclusion of a segment, when there is less time to consider comments, determine the appropriate course of actions, and check calculations.  Further, corrections made after the conclusion of a review results in additional resources to issue a new agency decision, the costly publication of amended *Federal Register* notices, and potentially delayed liquidation of entries, in instances where an error has in fact occurred.  These factors all contribute to Commerce's well-established practice of requiring parties to brief ministerial errors at the earliest opportunity.

In this regard, the Court recognized that the regulations stipulate that "Comments concerning ministerial errors made in the preliminary results of a review should be included in a party's case brief" and further that a party's case brief "must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results . . ."[87] Nonetheless, it found Commerce's application of these regulations to be contrary to the requirements of section 751(h) the Act, which directs that Commerce

> shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section.  Such procedures shall ensure opportunity for interested parties to present their views regarding any such {ministerial} errors.

---

[86] *See* 19 CFR 351.224(c)(1); and 19 CFR 351.309(c)(2).
[87] *See 25-152 Remand Opinion*, at 19-20.

The Court reasoned that the use of "any" errors in the "final determination" indicated that Commerce must correct such errors, irrespective of whether those errors were present in the preliminary results.[88]

We respectfully disagree that Commerce's regulations, or our application thereof, are contrary to the dictates of the Act.  The Act stipulates that Commerce must ensure that interested parties have an "opportunity" to present their views regarding ministerial errors.  We find that Commerce's timing requirements for a select class of ministerial errors—*i.e.*, that those present in the preliminary results be presented in a case brief—is consistent with the Act's provision that the agency shall "shall establish procedures" to address such ministerial errors.

As the Court noted, in *QVD* the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) previously reasoned that parties are required to present ministerial error allegations concerning calculations contained in the preliminary results of review in the manner prescribed by Commerce's regulations.[89]  The *QVD* court explained that

> any alleged error in Commerce's calculation of the general expense ratio in the final results was necessarily present in the preliminary results, because Commerce made no change to the financial ratio calculations.  Commerce's regulations specify the procedure by which ministerial errors in the preliminary results of antidumping duty administrative reviews may be challenged. Commerce discloses any calculations made in the preliminary results to interested parties, and interested parties must point out any ministerial errors in their case briefs… Commerce's refusal to make a ministerial correction is not reversible error when the alleged mistake was discoverable during earlier proceedings but was not pointed out to Commerce during the time period specified by regulation.  For that reason as well, we conclude that the trial court properly rejected QVD's challenge to the financial ratio calculations.[90]

Although we recognize that the Court here evaluated this precedent and determined that the language in question was non-binding *dicta*—because the Federal Circuit in *QVD* resolved the

---

[88] *Id*. at 22-23

[89] *See QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011) (*QVD*).

[90] *Id*. (citing 19 CFR 351.224(c)(1); and 19 CFR 351.309(c)(2))

case before it by determining that the error in question was not, in fact, ministerial—we

respectfully disagree with this interpretation.  The Federal Circuit explained that "{e}ven if the

error alleged by QVD were ministerial in nature, Commerce's failure to correct it would not

constitute an abuse of discretion because QVD did not raise the issue in a timely fashion," and

"*{f}or that reason as well, we conclude* that the trial court properly rejected QVD's challenge to

the financial ratio calculations."[91]  The court's final sentence indicates that the decision rests on

two separate, independent, and binding holdings.[92]  Moreover, even if understood to be *dicta*, we

still find the Federal Circuit's explanation to be instructive and consistent with other U.S. Court

of International Trade cases upholding Commerce's practice in this regard.[93]  For example, in

*Xiamen Int'l Trade*, the Court held:

> Even assuming that Iceman Group raised an actual ministerial error, Commerce
> does not abuse its discretion when it declines to correct a ministerial error that was
> reflected in a review's preliminary results and that no one challenged.  In these
> *Preliminary Results*, Commerce published a separate rate for Iceman Group.  At
> that point, Iceman Group was conclusively on notice of Commerce's belief that

---

[91] *Id*. (emphasis added).

[92] *See Brenner v. Dep't of Veterans* Affairs, 990 F.3d 1313, 1317 (Fed. Cir. 2021) (citing *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("{W}here a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*.")).

[93] *See, e.g*., *The Ancientree Cabinet Co. v. United States*, 736 F.Supp.3d 1334, 1340 (CIT 2024) ("Ancientree first raised the issue of an {Export Buyer's Credit} offset to U.S. price in its Ministerial Error Comment {filed after the final results}. … Commerce's regulations required Ancientree to identify any ministerial errors in the preliminary results of the review and otherwise make all relevant arguments about those preliminary results in its administrative case brief.  Ancientree failed to use that opportunity to request an export subsidy offset to U.S. price, but now seeks a court-ordered remand for the agency to make that adjustment.  However, Commerce acts within its discretion when it declines to address errors untimely alleged, whether substantive or ministerial.") (citing *QVD*, 658 F.3d at 1328); and *Euro SME Sdn Bhd. v. United States*, Court No. 22-00108, Slip Op. 2024-16 (CIT February 12, 2024) ("Commerce found that parties alleging ministerial error in the preliminary results must do so in their case briefs to the agency.  Euro SME declined to submit any initial case brief following the agency's publication of its Preliminary Results.  That left Euro SME only the post-Final Results process to raise its objection.  Once again, the complaint was untimely because 19 CFR 351.224(c)(1) requires parties to raise any issues that are detectable in the Preliminary Results in their initial case briefs."); *see also Nagase & Co., Ltd. v. United States*, 719 F.Supp.3d 1343, 1354-55 (CIT 2024) ("But even if Nagase had timely proffered an objection during the ministerial error period following publication of the Final Results, its objection still would have been untimely.  Commerce never wavered in its use of the data Nagase provided.  The assessment rate Commerce calculated in its original determination was the same one it had published in its Preliminary Results.  Commerce's regulations have long provided that, following the Preliminary Results' publication, parties must submit a case brief to the agency containing all arguments that continue in the submitter's view to be relevant to the Secretary's final determination.") (internal citations omitted).

24

Iceman Group was the same entity as Iceman Food.  Since it did not challenge the appropriateness of the rate at that juncture, Commerce did not commit reversible error by not correcting the mistake later.[94]

We also note that the history of Commerce's implementation of the ministerial error provision is consistent with this approach.  In particular, Section 1333 of the Omnibus Trade and Competitiveness Act of 1988 required Commerce to establish procedures for the correction of ministerial errors in final determinations and final results of review[95] and, as part of that process, Commerce also implemented a process for addressing corrections to preliminary determinations in investigations.[96]  Commerce expressed its understanding that the preliminary results in a review served as notice to trigger a commenting period.  There, we explained: "The sole purpose of a preliminary results of review is to provide the parties with an opportunity to comment on {Commerce}'s initial analysis. … {and, further, Commerce} has concluded that it is not appropriate to correct ministerial errors in preliminary results of reviews {because s}uch errors can be corrected in the final results of reviews."[97]  Thus, this implementation of the ministerial error requirements, through the promulgation of its regulations, further evinces Commerce's understanding of the mandatory commenting period contemplated in the Act.

Nonetheless, despite these considerations, and in compliance with the Court's decision, we have modified our calculation to address the ministerial error under respectful protest.

---

[94] *See Xiamen Int'l Trade & Indus. Co. v. United States*, 953 F.Supp.2d 1307 (CIT 2013)) (*Xiamen Int'l Trade*) (internal citations omitted).

[95] *See, e.g.*, *Antidumping and Countervailing Duty Proceedings; Proposed Procedures for Review of Calculations and Correction of Clerical Errors*, 53 FR 5813 (February 26, 1988); *Antidumping and Countervailing Duty Proceedings; Procedures for Review of Calculations and Correction of Ministerial Errors*, 53 FR 41617 (October 24, 1988); and *Antidumping and Countervailing Duties*, 55 FR 9046 (March 9, 1990) (setting forth procedures for correcting ministerial errors in final antidumping and countervailing duty determinations and in the final results of administrative reviews).

[96] *See Antidumping and Countervailing Duties*, 57 FR 1131, 1132 (January 10, 1992).

[97] *Id.*, 57 FR at 1132.

## IV.    INTERESTED PARTY COMMENTS

As noted above, on March 23 and 24, 2026, the petitioners, Bien Dong/NTSF, CASEAMEX, and Luscious Seafood submitted comments on the Draft Results.[98]  We address these comments, as they relate to each of the issues presented in these remands, below.

### A.  Luscious Seafood's Review Request

*Luscious Seafood's Comments*

The following is a verbatim executive summary submitted by Luscious Seafood.  For further details, *see* Luscious Seafood's Comments at 2-7.

> As discussed herein, Luscious {Seafood} disagrees with {Commerce}'s Draft Remand. {Commerce} yet again set an unreasonable and impossibly high standard for Luscious {Seafood} to participate as a domestic interested party.  Luscious {Seafood} demonstrated that it engaged in commercial transactions involving the domestic like product during the {POR} in the underlying proceeding.  The claimed deficiencies and contradictions in information submitted by Luscious {Seafood}, cited by {Commerce}, are not material and should not serve as justification for denying Luscious {Seafood} the right to participate in administrative reviews before {Commerce}.  Accordingly, Luscious {Seafood} requests that {Commerce} reinstate its review of companies named in Luscious {Seafood}'s original review request in the underlying administrative proceeding.

*Petitioners' March 24, 2026 Comments*

The following is a verbatim executive summary submitted by the petitioners.  For further details, *see* Petitioners' March 24, 2026 Comments at 3-6.

> {Commerce}'s draft results properly recognize a fundamental premise of not just the statutory provisions allowing "interested parties" to request administrative reviews, but the U.S. legal system as a whole:  only those with a concrete stake in a legal or administrative process have the standing to request that the process take place.  Luscious {Seafood} failed to clear this hurdle, despite having multiple opportunities to do so.  At best, the record confirms that Luscious {Seafood} has failed to show any meaningful nexus between its fortunes and ongoing purchases and resales of the domestic like product.  At worst, it suggests that Luscious {Seafood}'s request was motivated by purposes wholly foreign to those for which domestic wholesaler standing exists.

---

[98] *See generally* Petitioners' March 23, 2026 Comments, CASEAMEX's Comments, Bien Dong/NTSF's Comments; Petitioners' March 24, 2026 Comments, and Luscious Seafood's Comments.

*Bien Dong/NTSF's Comments*

The following is a verbatim executive summary submitted by Bien Dong/NTSF. For further details, *see* Bien Dong/NTSF's Comments at 2-3.

> Bien Dong and NTSF agree with Commerce's continued determination that Luscious Seafood lacks standing as a domestic wholesaler to request administrative review in this proceeding.

**Commerce Position:** Commerce continues to find that Luscious Seafood was not a *bona fide* wholesaler of domestic like product with standing to request reviews in the underlying segment.[99] As discussed in the Draft Results, even after we issued additional questionnaires to Luscious Seafood on remand, the company's responses only further undermined its claim to be a *bona fide* wholesaler. Thus, we have made no changes to our analysis.

In the Draft Results, we explained at length why Commerce seeks to ensure that a party's claim to standing is legitimate. We also explained that, when applying the modified *bona fides* standard set forth by the Court, Commerce's analysis with regard to Luscious Seafood would remain unchanged. In this discussion, we highlighted numerous inconsistencies and inaccuracies in the company's submissions. For instance, it became apparent that (i) Luscious Seafood misled Commerce about the time period for which it had a valid business license (stating that it was awaiting "a copy of" its license when, in fact, it did not have one), (ii) the company provided two different versions of a signed and purportedly finalized invoice, with the earlier version containing information which the company stated that it did not possess at the time of issuance, and (iii) the company provided false statements regarding the role of a second individual in the company.[100] Thus, record evidence continues to undermine Luscious Seafood's assertion of wholesaler standing, even after the company was given additional opportunities to remedy prior

---

[99] *See Final Results* IDM at Comment 1.
[100] *See* pages 14-17, *supra*.

27

reporting deficiencies.  Tellingly, Luscious Seafood failed to engage in any meaningful way with the analysis presented on remand and simply rehashed its prior arguments that Commerce's inquiry was unfair[101] or that its reporting inaccuracies were not material.[102]  Although Luscious Seafood has not provided any novel arguments or bases to revisit the conclusion presented in the Draft Results, for the sake of completeness, we address each of its arguments here.

First, Luscious Seafood claims that Commerce's procedures in this review (and in the corresponding remand) were improper, and "serve to make participation by small companies virtually impossible."[103]  However, Commerce followed standard procedures that it has also applied to various other parties asserting standing as wholesalers of domestic like product, in both prior and subsequent segments in this proceeding.[104]  Thus, Commerce has treated similarly-situated parties in this proceeding in a similar manner.  Regardless of the size, experience, or sophistication of an interested party, Commerce expects to receive reliable information from that party.  Luscious Seafood provided squarely incorrect information, on multiple occasions, and the company presented conflicting or implausible explanations for its reporting deficiencies (or, in some cases, simply declined to address the discrepancies identified

---

[101] *See, e.g.*, Luscious Seafood Comments at 3.
[102] *Id*. at 2.
[103] *Id*.
[104] *See, e.g.*, *Vietnam Fish 18-19* IDM at Comment 1 (noting that, in response to Commerce questionnaires, "{b}oth CBBC and QMC have submitted sufficient evidence of the *bona fide* nature of their sales of domestic like product"); *Vietnam Fish 19-20* IDM at Comment 1 ("As an initial matter, and as noted above, Commerce solicited information regarding the *bona fide* nature of CBBC's wholesaling transactions"); *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results and Partial Rescission of Administrative Review; 2022-2023*, 90 FR 26004 (June 18, 2025) (*Vietnam Fish 22-23*), and accompanying IDM at Comment 1 ("We issued Luscious Seafood two questionnaires in this segment, which is fewer than we issued to another company seeking interested party status as a wholesaler in the instant review, and the same number of questionnaires issued to companies seeking interested party status in previous administrative reviews of this order") (internal citations omitted); and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of Antidumping Duty Administrative Review; Preliminary Rescission of Administrative Review; and Rescission of Administrative Review, in Part; 2023-2024*, 91 FR 6192 (February 11, 2026), and accompanying PDM at 5 ("Luscious Seafood, Maritime, and QMC claimed standing to request administrative reviews as U.S.-based wholesalers of domestic like product, pursuant to section 771(9)(C) of the Act.  Consistent with our approach in prior segments of this proceeding, we solicited information regarding the companies' wholesaling activities.").

by Commerce). This is insufficient to demonstrate standing for this administrative proceeding. Although Luscious Seafood characterizes its records as "imperfect," the deficiencies were fundamental, and they included flatly incorrect statements regarding the role of key individuals in the company and the existence of licensure. As noted above, Commerce expects that companies have basic information about their operations and personnel, and requiring companies to supply this information is neither unreasonable nor the creation of an impossibly high standard. Indeed, the bar is rather low in this regard; even so, Luscious Seafood failed to provide this basic information in various instances, as detailed above.

In a related argument, Luscious Seafood also asserts that Commerce "sought during the remand proceeding to justify its error by issuing additional questions."[105] On the contrary, Commerce emphasized its preference that issues of standing be resolved as early as possible in an administrative proceeding, through its standard practice of issuing questionnaires to wholesalers asserting standing prior to respondent selection.[106] However, in light of the Court's finding that Commerce improperly did not give Luscious Seafood additional opportunities to explain its reporting deficiencies during the underlying review, we afforded Luscious Seafood an opportunity to supply the missing explanations on remand.[107] In response to this opportunity, the company provided information that further undermined its claim to accurate reporting and good faith participation in this proceeding.

Second, Lucious Seafood states that its business license was irrelevant and that the record shows that Luscious Seafood's license "was in effect during most of the POR."[108] This

---

[105] *See* Luscious Seafood Comments at 2.

[106] *See Final Results* IDM at 10 (citing Standing Memorandum at 5) ("{I}t is critically important to resolve issues of standing as early as possible in a review. Here, we have already issued two questionnaires providing Luscious Seafoods the opportunity to establish its standing, and it was unable to do so. Accordingly, we intend to immediately treat the Luscious Seafoods review request as void, and proceed accordingly.").

[107] *See* February 9, 2026 Supplemental Questionnaire; and February 18, 2026 Supplemental Questionnaire.

[108] *See* Luscious Seafood Comments at 5.

statement is inaccurate; the license was not in effect for "most" of the POR. Rather, the record shows that it was only valid from May 23, 2022, to June 30, 2022 (a total of 39 days).[109] More importantly, the company was plainly deceptive when it stated that a copy of the license was not available; in fact, the company simply did not obtain one for the relevant period. This does not evince good faith participation in this proceeding.[110]

Third, Luscious Seafood asserts that the scale of its operations is not evidence of bad faith and is consistent with the scale of other interested parties. In principle, we do not disagree with this proposition. As Commerce stated in its Standing Memorandum, "{t}he Act and the regulations are silent on any minimum level of commercial activity required to qualify for interested party status in the context of an administrative review, and it has been Commerce's practice to enforce no such threshold."[111] Commerce did not determine that Luscious Seafood was of insufficient size to qualify as a wholesaler. Similarly, with respect to the POR transaction(s), Commerce did not require a minimum number of sales or volume. However, where there is only evidence of one, unprofitable sale, it is prudent for Commerce to ensure that a company has a legitimate, ongoing commercial interest in the proceeding by examining the company's operations as a whole. Here, Commerce determined that the host of reporting deficiencies undermined Luscious Seafood's claim to standing in the administrative process, as

---

[109] *See* Luscious Seafood December 30, 2022 SQR at Exhibit 1. The applicable POR is August 1, 2021 to July 31, 2022.

[110] Luscious Seafood states that a valid business license is not necessary for participation in Commerce's proceedings. *See* Luscious Seafood Comments at 5. The company mischaracterizes the issue. Regardless of whether a current business license is required *by Commerce*, the city in which Luscious Seafood was registered *does* require a business license for commercial transactions. Thus, having a valid business license would support a company's claim that it is a going concern. In contrast, where a company acquires a business license for a short period, makes a single transaction, and then lets the licenses lapse, these facts suggest just the opposite – that the company is not operating as a going concern. Furthermore, this scenario casts doubt on the company's claim that it was requesting review out of concern about unfairly traded imports; rather, these facts are inconsistent with the company's assertion that it intended to conduct business activity on an ongoing basis. In any event, the record indicates that Luscious Seafood made false claims regarding its licensure and linked those claims to its participation in this proceeding.

[111] *See* Standing Memorandum at 3.

the record contradicts Luscious Seafood's claim that it had ongoing business operations which would need protection from potentially-dumped imports.

Finally, Luscious Seafood contends that Commerce's analysis of potential affiliation was improper. With respect to its supplier of domestic like product, Luscious Seafood states that it was not affiliated with the company and, further, regardless of any such affiliation, its operations/transactions would be *bona fide*.[112] Regardless of the merits of this argument,[113] this contention misses the point. Commerce requested information concerning other deficiencies in Luscious Seafood's reporting in this segment of the proceeding, which included information about the relationships and business interests of Luscious Seafood's personnel.[114] Accurate information for such an analysis was not provided. As explained in the Draft Results, an individual that Luscious Seafood did not identify as working on behalf of the company was, in fact, a major participant in the company's operations: he was a contact listed on a shipping invoice; his contact information was associated with the company's business license; he ultimately became the owner of Luscious Seafood; the bank documentation provided during this remand shows that he was associated with one of the company bank accounts during the POR; and he is also associated with another company involved in the sale of subject merchandise.

Luscious Seafood's failure to timely disclose complete information regarding the circumstances under which it made its single sale, as well as the individuals involved in the

---

[112] *See* Luscious Seafoods Comments at 5.
[113] Luscious Seafood states that the relationship [                                    ] is not affiliation within the statutory definition. *See* Luscious Seafood Comments at 5. Commerce's interpretation of the affiliation provision has been addressed in various court cases. *See, e.g.*, *Echjay Forgings Private Ltd. v. United States*, 475 F. Supp. 3d 1350, 1364-69 (CIT 2020); and *Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan: Final Results of Antidumping Duty Administrative Review*, 69 FR 50166 (August 13, 2004), and accompanying IDM at Comment 3. *See also* section 771(33)(A) of the Act (listing persons who "shall be considered to be 'affiliated'" including "{m}embers of a family" and "{a}ny person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization").
[114] *See* February 9, 2026 Supplemental Questionnaire at 4.

transaction, is concerning. At a minimum, Luscious Seafood's obfuscation gives Commerce no confidence in the reliability of its reported information, including the stated basis for why the review request was made, *i.e.*, seeking protection from imports. Finally, and as emphasized throughout these final results of redetermination, Luscious Seafood's inconsistent – and at times outright false – reporting throughout this proceeding undermines its claim to be acting in good faith.

### B. Consideration of the Petitioners' Ministerial Error Allegation

*Petitioners' March 23, 2026 Comments*

The following is a verbatim executive summary submitted by the petitioners. For further details, *see* Petitioners' March 23, 2026 Comments at 2-3.

> While {Commerce}'s draft results continue to espouse the view that the agency validly rejected Petitioners' ministerial error allegation notwithstanding the clear and contrary statutory directive, it nonetheless has recalculated the margins consistently with Petitioners' ministerial error allegation. Because the recalculation is consistent with statutory requirements, fulfills the {the Court}'s's directive, and is otherwise appropriate, the agency should continue to adopt these revised calculations for the final results.

*CASEAMEX's Comments*

The following is a verbatim executive summary submitted by CASEAMEX. For further details, *see* CASEAMEX's Comments at 1-3.

> In its Draft Remand redetermination, Commerce (under protest) accepted the "ministerial error" alleged by {the petitioners}, and it revised the antidumping (AD) margin for CASEAMEX. Specifically, Commerce revised CASEAMEX's AD rate from $0.18/kg to $0.20/kg. Commerce should reverse this finding in its Final Remand results. The issue raised by {the petitioners} is not a true ministerial error. Regardless, Commerce appears to have wrongly concluded (without adequate explanation or support) that it intended to calculate marine insurance as a "percentage of value" rather than as a "per-unit amount." Commerce should therefore reverse its findings. At a minimum, Commerce must adequately explain its findings so the parties (and the Court) can better understand the basis of its decision.

32

*Bien Dong/NTSF's Comments*

The following is a verbatim executive summary submitted by Bien Dong/NTSF. For further details, *see* Bien Dong/NTSF's Comments at 2-3.

> {W}hile Bien Dong and NTSF do not find the ministerial error raised by {the petitioners} to be ministerial in accordance with 19 C.F.R. § 351.224(f) nor an error that Commerce is obliged to accept, Bien Dong and NTSF take no position on this issue for the purposes of this remand proceeding.

**Commerce Position:** Pursuant to the Court's directive, and under respectful protest, we continue to accept the petitioners' ministerial error allegation. We continue to find that the allegation identified an error that was ministerial in nature. Accordingly, we have revised the dumping margin calculated for mandatory respondent CASEAMEX; we have also assigned this margin to the companies receiving a separate rate.

The Act and Commerce's regulations define ministerial errors as "errors in addition, subtraction or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial."[115] Commerce finds that the petitioners' allegation meets this definition.[116]

CASEAMEX argues[117] that Commerce has not adequately demonstrated why the alleged error meets this standard. First, CASEAMEX asserts that the underlying documents appear to show that Commerce intended to calculate marine insurance as a per-unit amount (in dollars per kilogram) and not as a percentage of value.[118] We acknowledge that Commerce incorrectly labeled the marine insurance SV in the Preliminary Surrogate Value Memorandum narrative and

---

[115] *See* section 751(h) of the Act; and 19 CFR 351.224(f).
[116] Commerce provided its views concerning the appropriate timeline for submission of ministerial error allegations in the Draft Results. *See* pages 180-24, *supra*.
[117] *See* CASEAMEX's Comments at 3.
[118] *Id*. at 2-3.

33

in the Surrogate Value Spreadsheet as "USD/Kg."  The labels should have read "percent" to be

consistent with the source document (*i.e.*, RJG Consultants) as well as with Commerce's labeling

for other SVs that were based on percentages rather than per-unit amounts.  As explained above,

Commerce intended the marine SV to be multiplied by the gross unit price, as the source

document labels it as a "rate," *i.e.*, a ratio to be applied based on a percentage of a dollar value,

rather than to rely on the rate itself as a proxy for the expense.[119]  The Marine Insurance

worksheet clearly described the figure as reflecting a "rate" to be applied to a "value" in

numerous instances.[120]  Similarly, the source document from which the rate was derived (RJG

Consultants) also states that the "{r}ates are based on per $100.00 Value."[121]  Thus, Commerce

made a ministerial error by mislabeling the variable and applying it as a fixed expense amount,

rather than computing the per-unit expense by applying the applicable rate to the associated

insured value.

Second, CASEAMEX asserts that Commerce failed to explain the apparent differing

figures for the SV in question referenced in the margin analysis; specifically, CASEAMEX notes

a difference between the SV shown for marine insurance in the Preliminary Surrogate Value

Memorandum[122] and that shown in the respondent's SV submission.[123]  We do not agree that

such a discrepancy exists or that this observation undermines our conclusion regarding this

ministerial error.  As Commerce explained in the Preliminary Surrogate Value Memorandum,

Commerce valued marine insurance using insurance rates quoted by RJG Consultants.[124]  The

---

[119] *See* Respondents April 21, 2023 SV Submission at SV-14.

[120] *Id*. (presenting the figure as a "rate," "rate per $100 value," "Rate per $1 value," and "USD / 1 USD.").

[121] *Id*.

[122] *See* CASEAMEX's Comments at 3 (citing Preliminary Results Surrogate Value Memorandum at 8).

[123] *Id*. (citing Respondents April 21, 2023 SV Submission, at Exhibit SV-14).

[124] *See* Preliminary Results Surrogate Value Memorandum at 8 (citing Respondents April 21, 2023 SV Submission at SV-14).

value derived from the source document[125] is the same value found in the surrogate value spreadsheet.[126] The spreadsheet only displays two digits, but in both places the underlying values are identical figures to four decimal places (*i.e.*, 0.0103).[127] The value presented in the Preliminary Surrogate Value Memorandum narrative[128] is rounded to two decimal places (0.01), which is in line with our rounding of all the other SV to two decimal places in the narrative, except for one that was a very small number (where we presented additional decimal places). Thus, rounding explains the small difference in that instance. In any case, the figure applied in the calculation was directly from the source, and there was no discrepancy in this regard.[129]

For these reasons, CASEAMEX has not provided a basis for Commerce to reconsider its decision to find the above-refenced calculation error to be ministerial. In summary, in the *Preliminary Results*, Commerce made a ministerial error by improperly applying the marine insurance SV on a weight basis and we have now corrected that error, in accordance with the Court's direct instruction.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *25-152 Remand Opinion* and *25-153 Remand Opinion*, and in light of the record evidence, as discussed above, we have provided further explanation of our determination regarding Luscious Seafood's standing to request review as a wholesaler of domestic like product. Additionally, we have accepted the petitioners' ministerial error allegation and have calculated a revised margin of $0.20/kg for CASEAMEX in these final

---

[125] *See* Respondents April 21, 2023 SV Submission at SV-14.
[126] *See* Preliminary Results Surrogate Value Memorandum at Attachment I "AR19_SV" tab, cell H106 (electronic version in Excel).
[127] *See* Preliminary Results Surrogate Value Memorandum at Attachment I; and Respondents April 21, 2023 SV Submission at SV-14.
[128] *See* Preliminary Results Surrogate Value Memorandum at 8.
[129] *See* Draft Results Analysis Memorandum.

results of redetermination; we also will apply this rate to the separate rate companies under

review, *i.e.*, Cafatex; HVG; IDI; and Loc Kim.[130]

4/15/2026

X *Chris J. Abbott*

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[130] We note that Caseamex has a superseding cash deposit rate from a subsequent administrative review. *See Vietnam Fish 22-23*. Accordingly, if this redetermination is upheld by the Court, the margin assigned here will be applied only as an assessment rate for the POR for this company.